**Elmer DOLAN, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15079.**

United States Court of Appeals,
Eighth Circuit.

Jan. 21, 1955.

See also Shoulders v. United States, 218 F.2d 290.

Merle L. Silverstein, University City, Mo. (Mark M. Hennelly, St. Louis, Mo., on the brief), for appellant.

Kenneth C. West, Asst. U. S. Atty., Kansas City, Mo. (Edward L. Scheufler, U. S. Atty., Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

Elmer Dolan was convicted on March 31, 1954, by a jury upon an indictment filed December 18, 1953, based on § 1621, Title 18, U.S.C., charging him with having committed perjury on October 30, 1953, when testifying as a witness before the federal Grand Jury for the Western District of Missouri. The District Court, after denying a motion of Dolan for a judgment of acquittal notwithstanding the verdict or for a new trial, imposed sentence, and Dolan has appealed. He challenges the adequacy of

the evidentiary basis for his conviction and the fairness of the trial accorded him.

The record shows that Dolan was one of two police officers of the City of St. Louis, Missouri, who, the evening of October 6, 1953, found, arrested and brought by automobile to the Eleventh District Police Station in that city Carl Austin Hall, the man who kidnaped and murdered Robert Cosgrove Greenlease, Jr.; that the two officers arrived with Hall at the police station a few minutes before 9:00 P.M.; and that they had in the police car, in addition to Hall, two large metal suitcases and a brief case which had been in Hall's possession. The suitcases were found to contain large amounts of currency, and on October 7 the suitcases and the currency were delivered to the Federal Bureau of Investigation. The false testimony which the Government alleged that Dolan gave to the Grand Jury related to the time and the manner in which the metal suitcases containing this money were taken into the police station from the police car.

The substance of Dolan's testimony before the Grand Jury was that he first knew of the two suitcases when he got to the police station; that he took one of them out, and that Lieutenant Shoulders, the other police officer, who was with Dolan and was his superior, took out the other suitcase; that right after they got to the station the Lieutenant went into the station with Hall, and Dolan took one of the suitcases and a brief case from the car; that he took them back to Lieutenant Shoulders' office in the station; that Hall was already in the station then; that it was possibly a matter of minutes after Hall was in the station before Dolan went in with the one suitcase and brief case; that he saw Hall in there when he (Dolan) went into the station; that, after taking the cases back to Lieutenant Shoulders' office, Dolan came back to the front office desk where they book prisoners and take from them their personal property; that he there got a number to put in his re-port; that after that Hall was taken to a cell in the station; that Lieutenant Shoulders brought in the second suit-case right after Dolan came back [to the desk] and when all the property had been or was being taken from Hall.

The Government sought to prove, and contends that it did prove, that neither of the two metal suitcases was brought into the police station at or within minutes of the time when Hall was taken from the police car into the station; that Shoulders, Hall and Dolan came through the front entrance of the police station together; that they had no suit-cases with them; that they came to the booking desk with Hall virtually between the two officers, and that both of them were present at the desk during all the time Hall was being booked and his property was being taken from him; that, aside from money and some personal effects taken from Hall while he was at the booking desk, no other property of his was reported that night to the desk corporal.

In considering the sufficiency of the evidence to support the verdict of the jury, it is elementary that we must give to the Government the benefit of every reasonable inference which can be drawn from the evidence, viewed in the aspect most favorable to the Government. Affronti v. United States, 8 Cir., 145 F.2d 3, 5; Masse v. United States, 5 Cir., 210 F.2d 418, 419.

The Government's case on the issue of falsity of Dolan's testimony before the Grand Jury consisted mainly of the evidence of persons who were in the police station when Hall was brought in and booked.

Officer Bergmeier, the desk corporal at the station, whose hours were from 3:00 to 11:00 P.M., testified in substance that Dolan, Shoulders and Hall came into the station together and walked together to the booking desk; that, as they faced him (Bergmeier), Dolan stood at the right of Hall while he was being booked and his personal property taken from his pockets; that Shoulders was on the

other side of Hall and slightly behind him; that Dolan never left the desk while Hall was being booked; that he (Bergmeier) saw nothing brought in that looked like a suitcase, brief case or metal case; that he saw Dolan leave ten or fifteen minutes after the booking, and did not see him again that night; that he (Bergmeier) thinks that a few minutes after the booking Dolan and Shoulders went towards Lieutenant Shoulders' office.

Carl Schottler, a police officer, testified that he was standing at the right-hand corner of the booking desk, telephoning, at the time Hall was brought to the desk; that he saw Hall, Shoulders and Dolan standing to his (Schottler's) left; that Hall was in the center, Shoulders back of Hall, and Dolan to his left; that they were standing at the desk when he (Schottler) first saw them; that he saw no objects in the possession of any of them; that the booking took possibly three minutes; that when it was completed Hall was led away towards the "holdover" or cell block in the station.

Alex Magee, a police officer, testified that he was assigned to the Eleventh District Station on October 6, 1953; that he was in the station shortly before 9:00 o'clock P.M.; that he saw Shoulders and Dolan come there; that when he first saw them they were coming in the door of the station with a prisoner, who he later ascertained was Hall, "the kidnaper"; that the witness thought that Dolan was first, Hall next, and Shoulders behind Hall; that they went to the booking desk; that he saw no luggage in their hands; that, in response to a motion from Shoulders, he (Magee) walked to the entrance of the station; that Shoulders, Hall and Dolan were at the booking desk; that he saw them and saw Schottler using the telephone at the desk, but saw no bulky objects or luggage in their possession; that, after Hall was booked, Shoulders took him to the "holdover"; that Dolan was still at the desk; and that, after Shoulders came from the "holdover", he and Dolan

left the station together a few minutes after nine, he (Magee) thinks.

Thomas Crowe, a police officer assigned with officer Magee to a patrol car, testified that he was in the police station while Hall was being booked; that Dolan and Shoulders were with Hall at the booking desk; and that he saw no packages, luggage or bulky objects in the possession of any of them.

Several other eye witnesses were produced by the Government in support of its assertion that the testimony of Dolan before the Grand Jury as to the time and manner in which the suitcases were brought into the station was false. From what has already been said of the Government's case, it is apparent that there was ample evidence, if believed, from a sufficient number of witnesses to sustain a finding by the jury that Dolan had deliberately testified falsely as charged in the indictment. He could not have been at the booking desk with Hall and Shoulders and at the same time have been carrying a large metal suitcase through the station to Shoulders' office.

Dolan contends, however, that, even if there was substantial evidence that his testimony was false, the court was not justified in submitting the case to the jury and in instructing it that Dolan's testimony before the Grand Jury on October 30, 1953, was material to the investigation then being conducted by that body, because the evidence of the Government did not sufficiently establish the materiality of the testimony. It is conceded, as of course it must be, that the issue of materiality was one of law for the court and not one of fact for the jury. Carroll v. United States, 2 Cir., 16 F.2d 951, 954; Sinclair v. United States, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692; United States v. Moran, 2 Cir., 194 F.2d 623, 626.

The forewoman of the Grand Jury testified that on October 30, 1953, when Dolan appeared as a witness, it was "investigating the Greenlease case and also the missing part of the ransom money

\* \* \* it seemed that there was practically half of it missing." She also testified that the Grand Jury returned an indictment in the Greenlease kidnaping case.

No one reading the record in the instant case could have any illusions as to what the Grand Jury was investigating at the time Dolan appeared before that body as a witness on October 30, 1953. We quote the following excerpts from Dolan's own testimony at the trial, as to what occurred after he and Shoulders had been called back to the police station the night of October 6 while on the way to Shoulders' home after Hall had been booked and placed in a cell. After testifying that Shoulders went to talk to Mudd, the turnkey at the police station, Dolan was asked the following questions and gave the following answers:

"Q. Now, did you have another conversation with Lieutenant Shoulders then? A. Yes, he talked to Mudd and Mudd told him that Hall wanted to talk to him, that he wanted to tell him where the rest of the money was. So after he talked to Hall, or before, I don't recall which it was actually, he went in his office and opened the suitcases.

"Q. Were you there when these suitcases were opened at that time? A. I was back there by his office, yes, sir.

"Q. Where you could see him open the suitcases? A. Yes, sir. So after he had opened the suitcases and talked to Hall, Hall had admitted that he was the kidnapper and implicated Bonnie Brown Heady, so he come back and he told me to go back out to Hall's apartment where he was arrested and clean out everything he had there, see if I could find the guns they were talking about. \* \* \*"

■ Unquestionably, the Grand Jury had the right and was under the duty to investigate the kidnaping and murder of the Greenlease child by Hall and the disposition of the ransom money. The materiality of Dolan's false answers is clear in view of the scope of the Grand Jury's inquiry. United States v. Norris, 300 U.S. 564, 573, 57 S.Ct. 535, 81 L.Ed. 808.

The contention that an officer of the law who participates in the arrest of a kidnaper and murderer and the taking from him of suitcases containing large amounts of currency can with impunity give false testimony before a grand jury respecting the handling of the suitcases, requires no serious discussion. See and compare United States v. Hirsch, 2 Cir., 136 F.2d 976.

■■ The court ruled correctly upon the issue of the materiality of Dolan's testimony before the grand jury. Deliberate false swearing before a grand jury, tending to influence, mislead or hamper its investigation of a matter which it has authority to investigate, is perjury.

■ " \* \* \* Indeed, the purpose of the grand jury's inquiry is to get at facts which will enable it to determine whether formal charges should be made against some one and not to try offenders. Hendricks v. United States, 223 U.S. 178, 32 S.Ct. 313, 56 L.Ed. 394. As the investigation proceeds, whatever leads may be developed must be run down to find as accurately as possible what the truth is, and any false testimony which impedes and hampers the course of the investigation is material in the sense that it has a tendency to affect the ultimate action of the grand jury. Carroll v. United States, 2 Cir., 16 F.2d 951." United States v. McGovern, 2 Cir., 60 F.2d 880, 889. See, also, United States v. Hirsch, supra, at page 977 of 136 F.2d; United States v. Moran, supra, at page 626 of 194 F.2d; Doan v. United States, 9 Cir., 202 F.2d 674, 679. Cf. United States v. Norris, supra, at pages 573–574 of 300 U.S. at pages 538–539 of 57 S.Ct.

The District Court properly denied Dolan's motion for a directed verdict of acquittal.

The rulings of the court which Dolan contends made the trial unfair are: (1) failing to declare a mistrial after striking out the testimony of the government witness Staab; (2) admitting in evidence two metal suitcases which Dolan asserts were not properly identified; and (3) limiting the cross-examination of police officer Magee.

What counsel for Dolan sought to do in cross-examining officer Magee was to show that, just prior to his transfer to the Eleventh District, he had been reprimanded by the Board of Police Commissioners because of the report of a "colored lady" that she had been a victim of a crime and that officer Magee had told her he was not going to do anything about it. It was Dolan who was on trial for perjury, and not officer Magee for having at some time in the past been reprimanded for neglect of duty. The extent to which cross-examination upon collateral matters shall go is a matter peculiarly within the discretion of the trial judge. United States v. Manton, 2 Cir., 107 F.2d 834, 845. The trial judge in the instant case did not abuse his discretion in limiting the cross-examination of Magee.

There is no merit in the contention that the metal suitcases were improperly admitted in evidence. They were shown to be the identical suitcases which were delivered by police officers at the Eleventh District Police Station on the afternoon of October 7, 1953, to a special agent of the Federal Bureau of Investigation assigned to contact Lieutenant Shoulders and to obtain from him the moneys and properties in his possession. One of the suitcases at that time contained ten and twenty-dollar bills to the amount of $151,000.00, and the other similar bills aggregating $137,510.00.

Dolan himself, while under cross-examination, testified that he could not positively identify the two metal suitcases as being the ones that Hall had, since he (Dolan) put no mark of identification on them, but that they looked similar to the suitcases he saw the money in when they were opened at the police station the night of October 6, 1953. Whether the metal suitcases admitted in evidence were conclusively proven to be the suitcases which Dolan and Shoulders took from Hall is unimportant. They were, in any event, admissible as being like those suitcases. They were important mainly for the purpose of enabling the jury to judge whether such suitcases would or would not have been readily observable by those who testified that they saw nothing of the sort in the hands of Dolan or Shoulders at the time Hall was brought into the station and during the time he was being booked and placed in the "holdover" or shortly thereafter.

The District Court did not commit reversible error in denying a motion for a mistrial for having admitted the testimony, subsequently stricken, of Frank F. Staab, an agent of the Federal Bureau of Investigation, as to conversations had with Dolan in November, 1953. The substance of the agent's testimony was that Dolan, at an interview on November 3, said he would be interested in changing his testimony before the Grand Jury; that on November 22 Dolan was asked by the agent whether the suitcases were taken into the police station at the time Hall was taken in, and answered "No, afterwards"; and that, upon being asked who took the suitcases into the station, Dolan refused to answer.

The evidence of Staab had been admitted over objection. Counsel for Dolan moved that it be stricken and that the court declare a mistrial. The court, in ruling on the motion, said to the jury:

"The motion is sustained with reference to striking this witness's testimony, gentlemen, from the record. The testimony as given does not pertain to any matter in issue before you and you should disregard all of this witness's testimony or any statements that he has made to you from the witness stand. The motion for mistrial is overruled."

In his charge to the jury the court said:

"* * * In the course of this trial I have several times instructed you to disregard the statement made by counsel or by a witness, and particularly have I instructed you not to consider any of the testimony given by the witness Frank Staab, the FBI agent from Louisville, Kentucky.

"When such instructions were given to you it was because in my opinion under the law the matter that you were instructed not to consider was not a competent subject for your consideration regarding the issues in this case, or such as you could legally take into consideration under the law in arriving at a decision either as to the guilt or the innocence of the defendant, or of any other issue here submitted to you.

"Therefore, under your oaths, you must not consider the testimony of any witness or the statement of counsel, or any other evidence that I have stricken from the record and instructed you not to consider. As honorable gentlemen, mindful of your oaths, I know that you will not do so."

▮ The general rule is that where evidence is erroneously admitted the subsequent striking of it from the case, accompanied by a clear and positive instruction to the jury to disregard the evidence, cures the error. But if the evidence is of such an exceptionally prejudicial character that its withdrawal from the consideration of the jury cannot remove the harmful effect caused by its admission, a new trial will be granted. See Pennsylvania Co. v. Roy, 102 U.S. 451, 459, 26 L.Ed. 141; Hopt v. Utah, 120 U.S. 430, 438, 7 S.Ct. 614, 30 L.Ed. 708; and compare Waldron v. Waldron, 156 U.S. 361, 383, 15 S.Ct. 383, 39 L.Ed. 453; Throckmorton v. Holt, 180 U.S. 552, 567–568, 21 S.Ct. 474, 45 L.Ed. 663; Holt v. United States, 10 Cir., 94 F.2d 90, 94; Mora v. United States, 5 Cir., 190 F.2d 749, 752; United States v. Giallo, 2 Cir., 206 F.2d 207, 209–210.

A rule which would require a trial court to declare a mistrial and to discharge a jury whenever the court discovered that evidence had been improperly and mistakenly admitted would be absurd. What the applicable rule means, as every experienced trial judge understands, is that errors in admitting evidence ordinarily can and should be cured by striking the evidence and instructing the jury to disregard it, but that there can be exceptional situations in which such errors are incurable.

▮ The question whether the admission of evidence which turns out to be inadmissible requires such a drastic remedy as the granting of a mistrial is addressed to the sound discretion of the trial court, which has the feel of the case and is in a far better position than an appellate court to appraise the effect upon the minds of the jurors of the evidence improperly admitted and to determine whether the jury is capable of following the court's instructions to disregard such evidence. Cf. Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216, 67 S.Ct. 752, 91 L.Ed. 849, and Friedman v. United States, 8 Cir., 200 F.2d 690, 697. As was said by Mr. Justice Brandeis in Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439, "Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct."

▮ Our examination of the entire record leaves us in no doubt that Dolan had a fair trial; that, under the evidence and the applicable law, the question of his guilt or innocence was for the jury; and that its verdict was conclusive.

The judgment appealed from is affirmed.