**UNITED STATES of America,
Appellee,**

v.

**John ALU, Appellant.
No. 190, Docket 24257.**

United States Court of Appeals
Second Circuit.

Argued March 6, 1957.

Decided June 7, 1957.

30

James F. McGovern, Jr., Jersey City, N. J., for appellant.

Leonard P. Moore, U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y. (Marie L. McCann, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before MEDINA and WATERMAN, Circuit Judges, and GALSTON, District Judge.

WATERMAN, Circuit Judge.

The defendant, John Alu, appeals from a judgment of conviction on both counts of a two count indictment charging him with having willfully testified falsely, in violation of 18 U.S.C.A. § 1621,[1] before a United States Grand Jury sitting in and for the Eastern District of New York.

The only issue raised on appeal is whether the Government established, by competent evidence, that the defendant's allegedly perjured testimony was "material" to the grand jury investigation in which it was given. At the trial below the court denied the defendant's motion for a directed verdict on the

1. That section provides:

"Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both."

ground that his testimony was not material, and subsequently charged the jury that the testimony was material.

The Government introduced evidence tending to establish the following facts: On September 21 and September 28, 1955, the defendant, John Alu, testified under oath before the United States Grand Jury sitting in and for the Eastern District of New York, which was then investigating a robbery of the Woodside (Queens) Branch of the Chase Manhattan Bank that occurred on April 6, 1955. The Grand Jury had been given information tending to show that the robbery was committed by one Thomas Connelly, for whose arrest a warrant had been issued. The Grand Jury had also been informed that Connelly had been seen in the company of one Elmer ("Trigger") Burke in Charleston, South Carolina, shortly after the robbery. Both Connelly and Burke were reportedly acquainted with Isaac ("Izzie") Sabel, who owned a restaurant called The Carriage House in Charleston. Prior to Alu's testimony it was brought to the attention of the Grand Jury that Sabel allegedly had seen Connelly and Burke in the Charleston area during the spring and summer of 1955 subsequent to the Woodside robbery. In this setting the Assistant United States Attorney who was conducting the investigation before the Grand Jury asked the defendant Alu whether he knew Izzie Sabel and his wife Frances, and whether he was familiar with a place called The Carriage House. On two separate occasions Alu replied under oath that he could not remember ever meeting the Sabels and did not know of any place named The Carriage House.[2]

---

2. The first count of the indictment was based upon the following colloquy, which took place on September 21, 1955, between the defendant and Howard Gliedman, Assistant United States Attorney for the Eastern District of New York:

"Q. Did Pat ever introduce you to a man named Izzie who had a wife named Frances who lived in the Charleston area? A. I cannot remember.

\* \* \* \* \*

"Q. Do you know any place called the Carriage House, not as to where? A. I don't know.

\* \* \* \* \*

"Q. Do you know an Isaac Sabel, aka Izzie Sabel, 119 Beaufine Street, Charleston, SC? A. I don't know; I cannot remember the name, sir, I might have met him and I don't know; I have been all through the South, sir.

"Q. I am talking about a man that you have met and spoken to within the past year? A. That's right, I cannot recall it, sir.

"Q. Within the past year, do you remember speaking to an Izzie Sabel who had a wife Frances who lived at 119 Beaufine Street, Charleston, South Carolina and who run a night club? A. I cannot remember.

"Q. Would you say you did or not? A. As far as my recollection, I cannot remember.

\* \* \* \* \*

"Q. Do you now say that you have no recollection, no memory, of a man who is named Izzie, who has a wife named Frances? A. Sir, I know a lot of Izzie's, I cannot remember.

"Q. At this time you cannot remember any such couple? A. That's right, I cannot remember.

"Q. You cannot remember any such couple at this time? A. That is my recollection."

The second count was based on the following colloquy, which took place on September 28, 1955, between the defendant and Gliedman:

"Q. Do you remember an Izzie Sabel who lived in Charleston? A. I cannot remember.

"Q. So your answer is that you do not know him? A. I don't know him, sir.

"Q. All right, do you remember stopping off to see this Izzie Sabel at Charleston on your way up from Florida? A. I don't remember.

"Q. You don't remember. A. I don't remember.

\* \* \* \* \*

"Q. Do you remember visiting an Izzie Sabel on your way back from Florida in December of 1954? A. Sir, I don't remember.

"Q. You don't remember. A. No.

"Q. Do you remember going back again and visiting that same Izzie Sabel 2–3 weeks later? A. I don't remember.

"Q. Do you remember visiting that same Izzie Sabel on or about January 24th of this year? A. I don't remember.

"Q. In other words, you say you have no recollection? A. No recollection, sir."

At the subsequent trial of Alu for perjury both Izzie and Frances Sabel testified that they had seen the defendant on a number of occasions over a period of six or seven years. They further testified that Alu had stopped in to visit them at The Carriage House in July 1955, and had spent the following day with them at a nearby beach and at their home. Thus there was sufficient evidence to submit to the jury the question of whether Alu had testified falsely before the Grand Jury and whether he had done so knowingly and willfully. Indeed, on appeal the defendant does not allege any error in the submission of these issues to the jury, nor does he attack its verdict.

The defendant does vigorously contend, however, that the trial court erred: first, in refusing to direct a verdict for the defendant on the ground that the Government had failed to prove by competent evidence the materiality of the allegedly perjured testimony; and secondly, in subsequently charging the jury that Alu's testimony was material.

The Government maintains the purpose behind asking these questions of Alu was to obtain information leading to the discovery of the whereabouts of Connelly and Burke.

In order to establish the materiality of the defendant's testimony, the Government first put on the witness stand a special agent for the FBI. He testified that a warrant had been issued for the arrest of Connelly in connection with the Woodside robbery, and that Connelly had not been apprehended as of September 1955, but had been seen in the company of Elmer Burke and Izzie Sabel in the Charleston area subsequent to the robbery. The FBI agent then testified that he had given this information to Howard Gliedman, an Assistant United States Attorney for the Eastern District of New York.

The next witness was Gliedman, who testified that he had conducted the Woodside investigation before the Grand Jury and that he had presented to that body the information given to him by the FBI agent. At this point the trial judge stated that the Government had adduced sufficient evidence to establish the materiality of Alu's testimony.

We sustain this ruling, and hold that the trial court properly denied the defendant's motion for a directed verdict, and correctly charged the jury that the defendant's testimony was material.

██ The issue of materiality is one of law to be determined by the court, not one of fact for the jury. Sinclair v. United States, 1929, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692; Carroll v. United States, 2 Cir., 1927, 16 F.2d 951, 954, certiorari denied 273 U.S. 763, 47 S. Ct. 477, 71 L.Ed. 880; Harrell v. United States, 5 Cir., 1955, 220 F.2d 516, 518; Dolan v. United States, 8 Cir., 1955, 218 F.2d 454, 457, certiorari denied 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255; Travis v. United States, 10 Cir., 1941, 123 F.2d 268, 270; United States v. Slutzky, 3 Cir., 1935, 79 F.2d 504, 506. The test of materiality for statements made in a grand jury investigation is not that which is applied to evidence offered in civil or criminal litigation:

"As no formal charge * * * need have been made before a witness can be compelled to testify before a grand jury * * * it is obvious that a witness can rarely, if ever, know whether his testimony is relevant or not. Indeed, the purpose of the grand jury's inquiry is to get at facts which will enable it to determine whether formal charges should be made against some one and not to try offenders. * * * As the investigation proceeds, whatever leads may be developed must be run down to find as accurately as possible what the truth is, and any false testimony which impedes and hampers the course of the investigation is material in the sense that it has a tendency to affect the ultimate action of the grand jury." United States v. McGovern, 2 Cir., 1932, 60 F.2d 880, 889. See also Carroll v. United States, 2 Cir., 1927, 16 F.2d 951, 953, certiorari denied 273 U.S. 763, 47 S.Ct. 477, 71

L.Ed. 880; United States v. Hirsh, 2 Cir., 1943, 136 F.2d 976, 977, certiorari denied 320 U.S. 759, 64 S.Ct. 66, 88 L.Ed. 452; Dolan v. United States, 8 Cir. 1955, 218 F.2d 454, 458, certiorari denied 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255; La Salle v. United States, 10 Cir., 1946, 155 F.2d 452, 454. Cf. United States v. Moran, 2 Cir., 1952, 194 F.2d 623, 626, certiorari denied 343 U.S. 965, 72 S.Ct. 1058, 96 L.Ed. 1362; Woolley v. United States, 9 Cir., 1938, 97 F.2d 258, 262, certiorari denied, 305 U.S. 614, 59 S.Ct. 73, 83 L.Ed. 391.

In this sense Alu's testimony was material, because his denial of any knowledge or recollection of the Sabels might well have tended to impede and hamper the Grand Jury in its efforts to ascertain the whereabouts of Burke and Connelly.[3] Since Connelly was believed to have participated in the Woodside robbery and a warrant had been issued for his arrest, an inquiry designed to obtain information possibly leading to his apprehension was germane to the subject matter under investigation by the Grand Jury at the time of Alu's testimony.

█ The trial court did not err in admitting Gliedman's testimony on the issue of materiality. Since that witness had conducted the Woodside investigation before the Grand Jury, he was competent to testify to the subject matter of that investigation and to the information that had been presented to the Grand Jury prior to the taking of Alu's testimony. Of course, Gliedman was competent only to relate the details of the information that had been given to the Grand Jury; he was not competent to testify to the truth or falsity of the information which had been supplied to him by an FBI agent. This distinction was recognized and observed by both trial counsel and the court below. And, of course, Gliedman's opinion as to the materiality of Alu's testimony was inadmissible. See, e. g., Foster v. State of Texas, 1893, 32 Tex.Cr. 39, 22 S.W. 21; Washington v. State of Texas, 1887, 23 Tex.App. 336, 5 S.W. 119. Cf. People v. Goodheim, 1st Dept. 1919, 188 App.Div. 148, 176 N.Y.S. 468.

We feel constrained to comment, however, upon the propriety of calling Gliedman as a witness to establish the materiality of the defendant's statements to the Grand Jury.

Gliedman, at the time of the perjury trial, was an Assistant United States Attorney and Chief of the Criminal Division for the Eastern District of New York. As such, he was the immediate superior of the Assistant United States Attorney who presented the Government's case at that trial and who argued the appeal before us. In fact, Gliedman personally had drawn the language contained in the indictment charging Alu with the perjury for which he was tried, and at one point during that trial even participated in the presentation of the Government's case.

█ It has been widely recognized that lawyers representing litigants should not be called as witnesses in trials involving those litigants if such testimony can be avoided consonant with the end of obtaining justice.[4] We believe

---

3. In August a warrant had been issued for Connelly, who had been charged with bank robbery prior to the interrogation of Alu before this grand jury in September. Defendant does not question the authority of the grand jury to inquire concerning Connelly's whereabouts, and in view of the recent decisions upholding the broad inquisitorial powers of federal grand juries, see, e. g., United States v. Johnson, 1943, 319 U.S. 503, 510, 63 S.Ct. 1233, 87 L.Ed. 1546; United States v. United States District Court, 4 Cir., 1956, 238 F.2d 713, 722–723, certiorari denied 1957, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365; Homan Mfg. Co. v. Russo, 7 Cir., 1956, 233 F.2d 547, 551; United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 301–302; United States v. Smyth, D.C. N.D.Cal.1952, 104 F.Supp. 283 passim, we believe that a line of inquiry designed to assist in locating alleged participants in the bank robbery was within the permissible scope of the Woodside investigation.

4. See American Bar Association Canons of Professional Ethics, No. 19 (Appear-

that this prohibition is applicable to the United States Government and its attorneys as well as to private litigants and their attorneys. It is obvious that the opportunity for tailoring a witness's testimony to the needs of the Government's case is maximized if recourse is permitted to the testimony of an experienced trial attorney who is interested in the successful presentation of that case. Especially in criminal litigation, where so much is at stake for the defendant, must the Bench and Bar demand adherence to a principle that is designed to ensure objectivity in the presentation of evidence.

■ Nor do we believe that the Government was required by the exigencies of this case to put Gliedman on the stand. The Grand Jury stenographer, who testified at the trial to Alu's statements, could have also testified to the subject matter of the Grand Jury investigation at the time of the taking of Alu's testimony. Cf. People v. Goodheim, 1st Dept. 1919, 188 App.Div. 148, 176 N.Y.S. 468. She, of course, could have refreshed her recollection by reference to her notes. Or if her notes were too complex and unwieldy for that purpose, they might have been submitted as an official record to the trial judge, who then could have based the determination of materiality upon his examination of them. The latter procedure seems doubly commendable because it prevents the jury from hearing any prejudicial matter that might have been brought out at the Grand Jury proceedings.

■ A reading of the stenographer's notes to either judge or jury would not violate the rule of secrecy normally applicable to grand jury proceedings, since an exception to that rule is made in perjury trials based upon testimony given in such proceedings. United States v. Remington, 2 Cir., 1951, 191 F.2d 246, 250–251, certiorari denied 343 U.S. 907,

72 S.Ct. 580, 96 L.Ed. 1325; United States v. Rose, 3 Cir., 1954, 215 F.2d 617, 628–630; United States v. White, D.C. N.J.1952, 104 F.Supp. 120; In re Bullock, D.C.D.C.1952, 103 F.Supp. 639, 642; cf. N.Y.Code Crim.Proc. § 266; People v. Kresel, 1931, 142 Misc. 88, 254 N.Y.S. 193.

Alternatively, the Government might have introduced the testimony of the Foreman of the Grand Jury or any other member of that body in order to establish the precise posture of the Grand Jury investigation at the time Alu testified. See, e. g., Dolan v. United States, 8 Cir., 1955, 218 F.2d 454, 457–458, certiorari denied 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255. Cf. N.Y.Code Crim.Proc. § 266.

Despite the dubious propriety of the Government's reliance on Gliedman's testimony, we affirm the judgment of conviction because we find no error in the rulings of the trial court or in its submission of the case to the jury.

Judgment affirmed.

ance of Lawyer as Witness for His Client):

"When a lawyer is a witness for his client, except as to merely formal matters such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."