**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Ted JOHNSTON, Defendant-Appellee.**

**No. 81–1300.**

United States Court of Appeals, Seventh Circuit.

Reargued En Banc May 26, 1982.

Decided Oct. 1, 1982.

---

David C. Bohan, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellant.

Marvin Bloom, Chicago, Ill., for defendant-appellee.

Before. CUMMINGS, Chief Judge, and PELL, BAUER, WOOD, CUDAHY, ESCHBACH, POSNER and COFFEY, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.[*]

The issue is whether the district court, 664 F.2d 152 (7th Cir.), erred when it refused to permit the Assistant United States Attorney assigned to the case to testify in a pretrial suppression hearing. We reverse.

## I.

On May 21, 1980, defendant Ted Johnston and eleven co-defendants were indicted on thirteen counts of violating various provisions of the Comprehensive Drug Abuse Prevention and Control Act.[1] Count Two of the indictment alleged that defendant conspired with co-defendant Andrew Theodorou and others to import marijuana illegally with intent to distribute it. Counts Four and Seven charged that on two occasions in 1976, defendant and several co-de-

---

[*] With the consent of Judge Cudahy, substantial preliminary portions of this opinion have been adopted, in some instances with modifications, from the original panel opinion authored by Judge Cudahy, thereby permitting us the benefit of his scholarship.

1. 21 U.S.C. §§ 801–966 (1976).

fendants had possessed a large quantity of marijuana with intent to distribute.[2]

On August 8, 1980, defendant moved to dismiss the indictment or, alternatively, to suppress certain statements he had made to Drug Enforcement Administration ("DEA") agents in February, 1978. As grounds for his motion, defendant alleged that the statements had been made subject to a promise by DEA agents that he would not be prosecuted on any charge related to the subject matter of his statements.

A pretrial evidentiary hearing was held on February 19 and 20, 1981. At the outset of the hearing, Assistant United States Attorney Joseph Hosteny informed the district court that, because he anticipated some possibility of being called as a witness in that suppression hearing, he was withdrawing from further participation in the handling of defendant's suppression motion. He left the courtroom and was thereafter absent during the suppression hearing. Hosteny did participate, however, in the jury trial that followed of the other defendants severed from this case.

Five witnesses testified at the suppression hearing. From their testimony, certain facts appear to be undisputed. As early as 1977, defendant was the subject of an investigation by the New Mexico State Police into suspected smuggling of Mexican marijuana into the United States. At the same time, the DEA was investigating defendant's suspected involvement in a large-scale drug smuggling operation centered in Chicago. On February 13, 1976, defendant was arrested in San Francisco by local authorities and charged with possession of marijuana. Upon being informed of the arrest, Detective John Dunlap of the New Mexico State Police and Sergeant Richard Moore of the Metropolitan Narcotics Agency (New Mexico) traveled to San Francisco to interview defendant. The two met with defendant the next day, at which time defendant expressed a preference to talk to federal investigators.[3] Acting in response to this desire, Moore contacted the DEA in Chicago, and agents Timothy Sack and Lance Mrock were dispatched to San Francisco on February 15, 1978 to meet with the defendant.

Sack and Mrock questioned defendant on February 15 and 16, 1978. Also present during these interviews were Dunlap, Moore and Sergeant Gregory Corrales of the San Francisco Police Department.[4] After reaching some agreement with the DEA agents regarding the conditions under which he would talk, defendant proceeded to relate to the agents detailed information concerning his involvement in the smuggling ring headed by Theodorou. Defendant was subsequently released from custody and the San Francisco charges against him were eventually dropped.[5]

In support of his motion to suppress, defendant called Dunlap as a witness. Dunlap testified that it was his impression that defendant had been promised immunity from prosecution in exchange for information about the Theodorou smuggling operations. He also stated that during the

---

**2.** Theodorou and the other non-fugitive defendants pleaded guilty and have been sentenced.

**3.** No clear reason for defendant's reluctance to talk to the New Mexico police emerged from the suppression hearing. Dunlap testified that defendant feared that the state officials would leak any information he provided them to his former associates. Defendant stated during the hearing that when the state officials questioned him about Andrew Theodorou, he told them he would rather speak to DEA agents about a "deal."

**4.** Although there is basic agreement as to the identity of the persons who attended the interviews on February 15 and 16, there is consider-

able difference of opinion whether all of them witnessed the entire interview. The conflict is most pronounced with respect to two witnesses at the suppression hearing, Dunlap and Corrales. Defendant testified that Dunlap was present for the entire interview, while Dunlap said he was present for only 90% of the interview. Corrales' assertion that he never left the room during the interview was disputed by both Dunlap and Sack, who insisted that Corrales was not in the room for the entire period.

**5.** Corrales testified that the charges were dismissed in deference to an ongoing New Mexico investigation that would have been jeopardized had defendant's case proceeded to trial.

lengthy interrogation of defendant, the DEA agents made repeated assurances that the information given to them by defendant would not "come back" on him or "put [him] in jail."

Johnston also testified in support of his motion. He stated that he agreed to talk with the DEA agents if they would make three promises: (1) that the charges pending in San Francisco against defendant and his co-defendants would be dropped; (2) that he would not be arrested on charges relating to the information he was about to give them; and (3) that he would not be asked to testify or collaborate on related matters. According to defendant, the DEA agents told him that they would have to check on his requests, they left the room for between 15 and 20 minutes, and returned to tell him, "Okay. We got you a deal."[6] Defendant testified that only after Moore reassured him that he could trust the agents did he begin to describe his involvement in the Theodorou smuggling ring.

Johnston further stated on direct examination that shortly after his indictment in Chicago in 1980, he called Assistant United States Attorney Hosteny to complain that the government had broken its promise not to prosecute him. Defendant testified that Hosteny denied that any such promise had been made and that Hosteny was very angry with defendant for refusing to come to Chicago to testify saying to the defendant that "you are smuggling dope, and I don't like criminals" and "I am putting you in prison." The government, disputing the defendant's version of the telephone conversation, attempted to cross-examine defendant on that issue. The district judge interrupted the examination, cautioning the government not to call Hosteny as a witness against the defendant. After further discussion, during which the district court expressed its desire not to resolve "the word

of a lawyer against a defendant in a criminal case," the government ceased its cross-examination of defendant.

The government did call three other witnesses to support its contention that defendant had never been promised immunity from prosecution. DEA agent Sack testified that he specifically told defendant he would remain "accountable" for his actions, and promised only to assist defendant with respect to the pending San Francisco charges and to communicate defendant's cooperation to the United States Attorney in Chicago. Mrock and Corrales each testified that the only promise made to defendant related to DEA assistance on the San Francisco charges, and neither Mrock nor Corrales recalled any promise to convey defendant's cooperation to the United States Attorney.

After hearing the evidence, the district court denied defendant's motion to dismiss the indictment but granted the motion to suppress his statements to the DEA agents. Finding it implausible that Johnston would be willing to inculpate himself in a massive drug smuggling operation in violation of federal law in return only for a promise of assistance on a relatively minor possession offense,[7] the district court concluded that the statements had been induced by a promise that defendant would not be prosecuted.

Contrary to defendant's version, accepted by the trial court, the government offered to add to its evidence, using Assistant Hosteny as a witness supported by his file memorandum of the telephone conversation, testimony that the defendant did not suggest that any alleged immunity agreement had been either made or breached. The defendant only mentioned, according to the government's proffer, an alleged DEA offer of the payment of a sum of money for defendant's cooperation against another defendant. It is the government's position

---

**6.** In addition, defendant testified that he was offered, and refused, $10,000 by Sack if he would agree to sign a statement or to testify. Sack and Mrock both denied that such an offer was made, although Dunlap stated that a reward for defendant's cooperation in the Theodorou case was mentioned during the interview.

**7.** The district court accorded little significance to the DEA agents' promise of assistance on the San Francisco charges noting that Corrales had testified that those charges were dropped for reasons unrelated to DEA intercession on defendant's behalf. *See supra* note 5.

that the defendant's failure to even mention the alleged immunity agreement to Hosteny strongly suggests it does not exist. Further, it is claimed Hosteny's testimony would show that the defendant testified falsely about the telephone conversation. By the trial court's ruling, the incriminating statements of the defendant were suppressed, the government was not permitted to offer the impeaching telephone conversation evidence which might have also served to discredit the defendant's other testimony. The ruling also served to restrict cross-examination of the defendant.

The government perfected its appeal from this ruling pursuant to 18 U.S.C. § 3731 (1976).

## II.

The advocate-witness rule, which articulates the professional impropriety of assuming the dual role of advocate and witness in a single proceeding, has deep roots in American law. Today, the rule is reflected in the ABA Code of Professional Responsibility, which states as an "ethical consideration:"

> The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.[8]

■ The Code's Disciplinary Rules have codified this ethical consideration. The rules prohibit an attorney from accepting employment in contemplated or pending litigation when it is obvious that he will be called as a witness. If the need for his testimony becomes apparent after the attorney has undertaken employment in the case, he must withdraw from the conduct of the trial. These requirements do not apply, however, in exceptional circumstances enumerated in the Disciplinary Rules: where the testimony will relate solely to an uncontested or formal matter and there is no reason to believe that substantial evidence will be offered in opposition to the testimony, and where refusal to testify would work a "substantial hardship" on the client.[9] These ethical rules apply to all lawyers, including government prosecutors, although application of the rule varies depending on the circumstances in individual cases.[10]

■ In *United States v. Birdman*, 602 F.2d at 553–55, the Third Circuit recently

---

**8.** American Bar Association, Code of Professional Responsibility EC 5–9 (1978).

**9.** *Id.* DR 5 101(B), 5–102. The courts have generally given the "substantial hardship" exception a very narrow reading. *See* Note, *The Advocate-Witness Rule: If Z Then X, But Why?*, 52 N.Y.U.L.Rev. 1365, 1375–79 (1977).

**10.** In *United States v. Trapnell*, 638 F.2d 1016, 1025 (7th Cir. 1980), this court found no plain error when one of the prosecuting Assistant United States Attorneys briefly took the stand without objection to testify about an uncontested formal matter which assertedly could not have been provided by another witness. It was stated that the appearance of counsel as a witness is improper, except in extraordinary circumstances.

In *United States v. Birdman*, 602 F.2d 547, 551 57 (3d Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980), the court considered the situation where the Assistant United States Attorney appeared as a witness before the grand jury and then participated in the trial. The court explored the whole area of the dual role of prosecutor and witness. It is explained that although there is a strong judicial reprobation of a prosecutor testifying at a criminal trial, there is no per se prohibition of the practice. That alone is not enough for an automatic grant of a new trial, 602 F.2d at 556–57.

*Phillips v. Wyrick*, 558 F.2d 489, 497 n.3 (3d Cir. 1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978), finds nothing unconstitutional in the fact that an assistant prosecutor testified in a state criminal trial and affirmed the denial of the writ of habeas corpus. The court notes, however, that it is unseemly, ineffective, and inconsistent.

*United States v. Armedo-Sarmiento*, 545 F.2d 785, 793 (2d Cir. 1976), *cert. denied*, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977), states that although the court does not encourage testimony by any member of the staff of the United States Attorney, that person is not disqualified as a witness in a case in which he plays no other role.

*United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976), is a slightly different situation. The government used its file memorandum of a pretrial interview of an assistant with a witness to refresh the recollection of the witness. It was the defendant who sought to call the Assistant United States Attorney as a witness to explore the circumstances of the memorandum, argu-

examined the case law and identified four policies said to be served by the advocate-witness rule. First, the rule eliminates the risk that a testifying prosecutor will not be a fully objective witness given his position as an advocate for the government. Second, there is fear that the prestige or prominence of a government prosecutor's office will artificially enhance his credibility as a witness.[11] Third, the performance of dual roles by a prosecutor might create confusion on the part of the trier of fact as to whether the prosecutor is speaking in the capacity of an advocate or of a witness, thus raising the possibility of the trier according testimonial credit to the prosecutor's closing argument. Fourth, the rule reflects a broader concern for public confidence in the administration of justice, and implements the maxim that "justice must satisfy the appearance of justice." This concern is especially significant where the testifying attorney represents the prosecuting arm of the federal government. In addition to the policies articulated in *Birdman,* there is at least one other consequence deserving of consideration, particularly by United States Attorneys. United States Attorneys are expected to adhere to the highest standards of professional behavior and to be worthy of public trust and confidence. Nevertheless, the United States Attorney who becomes both witness and advocate runs the risk of impeachment or otherwise being found not credible by the district judge. That would be an unfortunate situation for government counsel which could impair not only continuation as an effective advocate in the case, but could also produce lingering adverse aftereffects.

We have found no case in which the issue has arisen in a pretrial suppression hearing

---

ing the memorandum had been used to suggest, not to refresh. The court found no "compelling and legitimate need" to permit the use of the prosecutor as a witness by the defendant, commenting that the procedure confuses the distinction between advocate and witness, argument and testimony. If there had been a compelling reason the proper procedure, the court suggests, was to conduct the hearing outside the jury's presence.

In *United States v. Torres,* 503 F.2d 1120, 1125 ·26 (2d Cir. 1974), the court reversed a conviction for the cumulative effect of three errors, one of which was the government's use as a witness an Assistant United States Attorney, who had been at counsel table, to testify about an impeaching event which occurred during trial. The court admonished that the Assistant should not have been used as a witness unless all other sources of possible testimony had been exhausted.

*United States v. Fiorillo,* 376 F.2d 180, 185 (2d Cir. 1967), found no error in defense counsel testifying where no prejudice to the defendant resulted even though the likelihood of testifying was anticipated by defense counsel.

*Gajewski v. United States,* 321 F.2d 261, 268 (8th Cir. 1963), *cert. denied,* 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964), applied the rule finding no abuse of discretion in the trial court's refusal to permit the defendant to call as a witness the United States Attorney who was trying the case.

· In *United States v. Clancy,* 276 F.2d 617, 636 (7th Cir. 1960), *rev'd on other grounds,* 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961), this court found no abuse of discretion in refusing to let a defendant's counsel testify unless he withdrew from the case.

*United States v. Alu,* 246 F.2d 29, 33–34 (2d Cir. 1957), affirmed a conviction for false statements to a grand jury "despite the dubious propriety" of the government's calling on an Assistant United States Attorney to testify as to the materiality of the defendant's statements to the grand jury.

In *United States v. Pepe,* 247 F.2d 838, 844 (2d Cir. 1957), an Assistant United States Attorney attempted to impeach a witness by testifying as to what that witness had said before the grand jury. The court deplored the practice of the prosecutor testifying unless unavoidable, and indicated that when that appears to be necessary the trial of the case should be entrusted to another Assistant.

In *Christensen v. United States,* 90 F.2d 152 (7th Cir. 1937), this court held that the defendant's attorney was competent to testify. Although the trial judge would have been justified in excluding the attorney from further participation in the trial, the attorney's evidence was admissible and its exclusion an error.

11. In *United States v. Cerone,* 452 F.2d 274, 288 (7th Cir. 1971), *cert. denied,* 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972), however, this court was unpersuaded by the so-called "awesome-office" theory. We held that the mere fact that a witness holds an office of public trust should not disqualify him as a witness so long as he does not otherwise participate in the trial. *Accord, United States v. Dellinger,* 472 F.2d 340, 409 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973).

and the witness prosecutor intended to participate in the subsequent jury trial. What emerges in general from the cases is that it is a situation to be avoided if possible, but counsel's testimony will be permitted in extraordinary circumstances and for compelling reasons, usually where the evidence is not otherwise available. In those circumstances, it is often suggested, however, that counsel withdraw from further participation in the case.

▪ The government contends that the rule prohibiting prosecutors from appearing as witnesses has no application to proceedings tried before a judge. It points out that all of the cases relied upon by defendant that applied the advocate-witness rule involved prosecutors who sought to give testimony before a grand or petit jury. As a second point, the government argues that, because the district judge was trier of fact in the suppression hearing and a jury would perform that function at trial, those were in essence *separate* proceedings for purposes of the advocate-witness rule;[12] therefore, had Assistant United States Attorney Hosteny been permitted to testify at the suppression hearing, he would not have assumed the dual role of advocate and witness in a *single* proceeding.

The government in arguing that the rule has *no* application to a proceeding tried to a judge and not to a jury asks for too much. The *Birdman* policy considerations remain applicable, although the risks of being less without a jury, more flexibility may be permitted. A judge, as compared with a jury, may be better able to take account of a witness-prosecutor's adversarial role in weighing the objectivity of his testimony. A judge may also be less apt than a jury to confuse the roles of witness and prosecutor. Finally, to the extent that the "awesome-office" rationale remains a viable one after this court's decision in *United States v.*

*Cerone,* 452 F.2d at 288, we would expect that a judge would not be swayed by the prominence or prestige of a government prosecutor in assessing the credibility of his testimony. But the maintenance of public confidence in the ultimate fairness of judicial proceedings is no less applicable to proceedings before a judge than it is to those before a jury.

Had the district court allowed Hosteny's testimony, it would have been faced with the troublesome prospect of deciding which of two witnesses—defendant Johnston or Hosteny—was telling the truth about the telephone conversation. A judge in that position would be expected to make a determination without prejudice to the defendant and without contravening the advocate-witness rule, so long as the testifying prosecutor did not otherwise participate in the case as suggested in *Cerone.* We have some concern about the danger of possible prejudice to the defendant as well as the appearance of unfairness that might result if the district court resolved the testimonial conflict between the two witnesses and then presided over a trial pitting these same protagonists as litigants. Whatever the district court's ruling on the suppression motion, it would have had to find one of the two witnesses to be less than credible. The court's subsequent rulings during trial could, therefore, create the appearance, even if they did not reflect the reality, of favoring the cause of the party-witness whose testimony the court had earlier believed. Particularly in criminal trials, where the full weight of the government is brought to bear against a solitary individual, even the appearance of such bias could impair public confidence in the fairness of the judicial process.[13]

The government next argues that a pretrial suppression hearing and a subsequent

---

12. The author of this opinion in a dissent to the original panel opinion considered the separate proceeding argument as a fiction, but following the *en banc* hearing has modified that view.

13. In summarizing his objections to Hosteny's testimony, the district judge put it this way:

> For these defendants on trial, in my judgment, it would contaminate the sense of fairness of this trial for me to be asked to let a prosecutor I know very well and for whom I have the greatest respect, for me to be asked to have him appear one moment as a prosecutor and then another moment as a witness.

jury trial are separate proceedings for purposes of the advocate-witness rule. Although it is one and the same case, some different considerations may apply to its separate stages. The suppression hearing is a preliminary matter outside the presence of the jury. It is concerned with one of many matters a judge may have to determine before trial. We believe the suppression hearing may be considered separate from the trial for these purposes if necessary, but that does not entirely resolve the application of the advocate-witness rule.

In the present case other possible alternatives were not suggested to the trial judge nor considered by him sua sponte. For example, the trial judge could have submitted the suppression motion to a magistrate to hear the conflicting testimony and recommend a finding of fact, or he could have ruled on the suppression motion and then reassigned the case to another judge for trial. The most obvious alternative was for the witness-prosecutor to withdraw from any further participation in the trial of defendant Johnston. The government opposes the mandatory imposition of that last alternative as a requirement for several reasons. It could jeopardize, it argues, a successful prosecution, by giving the government the undesirable options of either not offering the testimony on substituting prosecutors. It is pointed out that substitution would often disqualify the prosecutor most familiar with the case and require duplicative work by a substitute prosecutor, a substantial hardship in a major case. It could also lend itself to abuse by defendants attempting to disrupt and manipulate the conduct of prosecution with speedy trial complications. These are valid considerations to be weighed along with other factors, including, for instance, the time remaining before trial is scheduled.

■ In this particular case where the issue has now been raised and additional time

has been consumed in this uncertain appeal, a major United States Attorney's Office may be expected to be prepared to substitute prosecutors without prejudice to its case. Hosteny, as we understood at oral argument, has been assisted in this case by other prosecutors. However, we are not imposing substitution of prosecutors as a *per se* mandatory requirement, particularly in the circumstances of this case. Substitution, however, is ordinarily to be preferred.[14]

■ The general rule to be followed by a prosecutor who has interviewed a witness should be in accord with the American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function (Approved Draft 1971), § 3.1(f), which provides:

> The prosecutor should avoid interviewing a prospective witness except in the presence of a third person unless the prosecutor is prepared to forego impeachment of a witness by the prosecutor's own testimony as to what the witness stated in an interview or to seek leave to withdraw from the case in order to present his impeaching testimony.

Depending on the circumstances, however, as we have already noted, exceptions to substitution may be permitted.

The careful and experienced trial judge at the conclusion of the suppression hearing informed the parties that he would not consider any of the evidence of the telephone conversation testified to by the defendant. The apparent balance achieved by excluding both the defendant's testimony about the telephone conversation and Hosteny's anticipated impeaching response served only to immunize some of the relevant facts from being considered in the decisional process. The trial judge declined to make a credibility determination between an As-

14. If the matter of the contents of the telephone conversation unexpectedly arises for any reason during the jury trial of the defendant prompting Hosteny, if he remains in the case, to leave the counsel table for the witness chair, then a much more serious problem arises which we need not reach at this time. The government, however, if there is any likelihood of that possibility, should plan accordingly in keeping with the general principles discussed in this opinion.

sistant United States Attorney and the defendant. That is understandable and usually to be avoided, but in this case it was just another of the difficult determinations often facing a trial judge.

It was, after all, the defendant who placed the telephone call to Assistant Hosteny. It was the defendant who voluntarily chose to testify as to the contents of that telephone conversation. The defendant raised no objection to the government's proposed rebuttal by calling Assistant Hosteny. It was the defendant who chose the means of communication which restricted the only possible government rebuttal witness to that one assistant the defendant chose to call on the telephone.

■ In these circumstances, where the defendant attempts to take advantage of a situation that was his own doing, not the government's, the government, by the only means at its disposal, should be permitted to fully attempt to thwart suppression and to impeach the defendant. We, however, take no position on the merits of the motion.

■ Upon remand Hosteny shall be permitted to testify at a new suppression hearing if the necessity again arises. At the original suppression hearing, Hosteny did not seek to participate other than as a witness. Where no surprise is involved, that restriction remains. The trial court's options of referring to a Magistrate or assigning the case to another judge for trial remain for consideration. If Hosteny further seeks to continue as a prosecutor at trial, there being no reasonable likelihood of his being called as a witness at trial, he may be permitted to do so in the circumstances of this case. In other situations a reasonable showing that substitution of government counsel at that time could prejudice the government's case would be required. Possible prejudice to the government's case as well as the defendant should be considered and balanced by the trial judge in the context of the particular circumstances. As a general rule, the government prosecutor is not to be automatically disqualified as a witness or as trial advocate after testify-

ing at a pretrial suppression hearing, but testifying and continuation as counsel shall be subject to the sound discretion of the trial judge exercised in accordance with the general principles discussed in this opinion.

This case is therefore reversed and remanded for a new suppression hearing. Circuit Rule 18 shall apply.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, dissenting.

I respectfully dissent for the reasons I explained in the original panel opinion, reported at 664 F.2d 152. Although I think the majority's solution to the knotty problem presented by this case is well-intentioned, it must lead either to the effective nullification of a long and firmly established ethical rule or to an unwarranted depletion of prosecutorial resources.

The solution proposed by the majority is to allow a government prosecutor to testify against a criminal defendant at a pre-trial suppression hearing. If the prosecutor then seeks to represent the government at trial, this course of action will be permitted only if the government can persuade the trial court that substitution of counsel—the preferred solution in the majority's view— would unreasonably prejudice the government's case against the defendant and that the prejudice to the government outweighs the possible prejudice to the defendant of allowing the testifying prosecutor to try the case. If I understand the solution correctly, I think it deficient on several counts.

First, the requirement of showing prejudice to the government would be unnecessarily wasteful of prosecutorial and judicial resources. Presumably, the trial court in deciding whether substitution of counsel would prejudice the government's case would have to inquire into such matters as the extent of the testifying prosecutor's preparation for trial, the nature and scope of the government's investigation into the alleged criminal acts, the number of prosecutors involved in the case, the availability of substitute counsel and the amount of time remaining before the trial is scheduled

to begin. If taken seriously by the trial courts, this showing of prejudice to the government could easily consume a substantial amount of time of these courts as well as of the prosecution. It could also result in further delay of many criminal trials. In addition, we might expect to receive a healthy number of criminal appeals alleging as error the trial court's determination of prejudice. But wasted resources is not the only drawback of the majority's solution; the required determination of prejudice would often raise ethical problems of its own. The trial court's necessary examination of the prosecutor's trial preparation would often require anticipation of some of the factual and substantive legal issues that might arise during the course of the trial. Pre-trial consideration of these issues would be improper and, to avoid even the appearance of impropriety, the trial judge in such cases might feel obliged to recuse himself or herself from the trial of the case after deciding whether the testifying prosecutor should be compelled to withdraw. Recusal by the trial judge, however, would itself eliminate the advocate-witness problem. Hence, in these cases the majority's proposal seems to result in fruitless inquiry into prejudice, the only result of which is to taint the trial judge and force his withdrawal from the case. As indicated below, the solution proposed by the original panel achieves the same basic result but dispenses with the burdensome and contentious determination of prejudice to the government and to the defendant.

Second, the majority's direction to the trial court to balance prejudice to the government against prejudice to the defendant if a testifying prosecutor is allowed to try the case is about as simple as weighing a cupful of air. The prejudice to the defendant, as the majority notes, is the bias, or more likely the appearance of bias, on the part of a trial judge who presides over a criminal trial after determining in a pre-trial hearing that either the prosecutor or the defendant was less than credible. The advocate-witness rule is a broad prophylactic rule designed to prevent even the appearance of impropriety. Because prejudice to

a defendant in a particular case is almost impossible to measure, the rule is not susceptible to the *ad hoc* application mandated by the majority. Thus, the likely consequence of the majority's holding is that the government, whose interests in the matter are more demonstrable than those of the defendant, will in most cases prevail. The policies supporting the advocate-witness rule, which the majority purports to reaffirm, can be no match for the concrete showing the government will ordinarily be able to make in support of its claim of prejudice.

Third, the majority also invites the trial court to consider the particular context of the prosecutor's testimony, in this case the circumstances of the defendant's telephone call to the Assistant United States Attorney. In reaching its conclusion in the case before us, the majority stresses the fact that it was the defendant who initiated the telephone conversation and who first raised the matter which is the subject of the testimony. I do not understand why or how these circumstances should figure in our analysis. If the advocate-witness rule is to be scuttled every time it is the defendant who first testifies on a subject about which the prosecutor would like to take the stand in rebuttal, very little of the rule would remain.

In light of these rather serious deficiencies in the majority's proposed solution to the advocate-witness problem, I believe that the original panel's solution was clearly preferable. According to the panel opinion, there are basically two ways to address the problem, neither of which sacrifice the important policies supporting the rule against prosecutors appearing as witnesses in their own cases. First, the prosecutor who wishes to testify against the defendant in a pre-trial hearing may be required to withdraw from any further participation in the hearing or trial. The majority labels this the preferred solution and leaves the matter to the trial judge to decide on the basis of a nebulous balancing test. I would leave the question to the government to determine by the course it pursues, since the

government is in the best position to decide whether the value of a prosecutor's testimony outweighs the value of his or her services at trial. But even then, withdrawal by the prosecutor is not in my view the only, or even the preferred, solution. As the government has argued in this case, weighing the prosecutor's testimony against his or her participation in the trial may well present a Hobson's choice. The prosecutor's participation at trial might be indispensable but to forego testifying at a suppression hearing may well risk dooming the merits of the government's case against the defendant. Because I believe that the necessity for making such a choice would unnecessarily defeat the objectives of criminal law enforcement, I am less willing than the majority to applaud substitution of counsel as the preferred solution. That is why the original panel did not hold that withdrawal by the prosecutor was mandatory or even preferred. See 664 F.2d at 158 n.26.

There is another solution to the advocate-witness problem, suggested for the first time by the government but never presented to the district court. Because the ethical problem arises from the fact that the trial judge is asked (1) to make a credibility determination between a prosecutor and a defendant and (2) later to preside over the defendant's trial in which the prosecutor participates, the problem can be eliminated completely by separating these functions. As described in the panel opinion, this separation can be achieved by either of two methods: the trial judge can refer the suppression motion to a magistrate to hear the conflicting testimony and recommend a finding of fact, or the trial judge can hear and decide the motion and then transfer the case to another judge for trial. Thus, substitution of judges can remedy the ethical problem in the same manner as substitution of counsel, but with much less impairment of prosecutorial efficiency. Because pre-trial motions will typically, as in the instant case, involve issues far afield from those arising at trial, withdrawal by the trial judge after ruling on the pre-trial motion will not often result in the loss of the benefit of the trial judge's familiarity with, or expertise in, a given case.

For these reasons, I disagree with the majority's proposed solution to the advocate-witness problem. I also disagree with the particular disposition of the instant case. I am simply unable to conclude that Judge Leighton abused his discretion when he refused to allow the Assistant United States Attorney to testify. The value of the proffered testimony was marginal at best since five of the witnesses at the suppression hearing were present in person during the interviews at which the defendant claims he was granted immunity from prosecution. Moreover, Judge Leighton in ruling on the motion specifically disregarded the defendant's statement concerning the telephone call. Under these circumstances and in light of the government's failure to propose alternatives to the exclusion of the testimony, it is impossible for me to say that there was an abuse of discretion. It is almost equally difficult for me to perceive this question of management of a complicated situation by a trial judge required to act without much warning as an appropriate subject for an *in banc* rehearing.