**UNITED STATES of America,
Petitioner,**

v.

**Angela JOHNSON, Defendant.**

**No. CR 00–3034–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

Feb. 9, 2001.

Patrick J. Reinert, Assist. U.S. Atty., Cedar Rapids, IA, for plaintiff.

Robert R. Rigg, Drake University Legal Clinic, Des Moines, IA, for defendant.

## MEMORANDUM OPINION AND ORDER REGARDING JOINT MOTION ON ISSUES OF ATTORNEY REPRESENTATION

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .................................................... 1091
 A. Factual Background ............................................ 1091
 B. Procedural Background ........................................ 1091

II. LEGAL ANALYSIS .............................................. 1093
 A. Willett's Continued Representation Of Johnson ......................... 1093
 1. The concerns and the inquiry ................................. 1093
 2. Is a conflict of interest likely to arise? ............................. 1095
 a. Were any confidences imparted to defense counsel by the witness? ........................................... 1096
 b. Did the witness waive any privilege by debriefing? ............... 1096
 c. Is any potential conflict of interest sufficiently "serious"? ........ 1099
 3. Remedying any potential conflict ................................... 1100
 a. Has Johnson made an "acceptable waiver" of any conflict? ....... 1101
 b. Is a further remedy required? ................................. 1101
 B. Reinert's Continued Representation Of The United States ................ 1103
 1. Applicable principles ........................................... 1104
 2. The circumstances of the prosecutor's testimony ..................... 1106
 3. Application of the principles in the circumstances presented .......... 1107

III. CONCLUSION .................................................. 1108

Concerned that unusual circumstances in this criminal prosecution may disqualify two of three defense counsel and the lead prosecutor, the parties have wisely brought their concerns about continued representation before the court in a joint motion well in advance of trial. The parties are commended for their conscien-

tiousness, not least because the court finds that the parties' motion raises issues that potentially affect the fairness of the trial of a death penalty eligible criminal defendant charged with very serious offenses, including five counts of aiding and abetting the murder of a witness in violation of 18 U.S.C. § 1512.[1]

## I. INTRODUCTION

### A. Factual Background

The charges against defendant Angela Johnson are premised, in part, on the government's contention that a jailhouse informant, Robert McNeese, convinced Johnson to confide certain inculpatory information to him while both were incarcerated in the Benton County Jail. Prior to this incident, while McNeese was in the Linn County Jail on unrelated charges, McNeese's investigator, Geoffrey Garrett, sought out attorney Alfred Willett to see if he would represent McNeese. The parties agree that Willett spoke with McNeese at the Linn County Jail for about one hour, but ultimately did not undertake to represent McNeese. McNeese subsequently debriefed fully about his criminal conduct pursuant to a plea agreement with the government. The parties also agree that *if* McNeese revealed any confidential matters to Willett during the interview, then those matters are, or at least were, protected by attorney-client privilege. At an *in camera* hearing before the court, however, Willett and McNeese disagreed about whether any confidences were imparted during Willett's conference with McNeese: McNeese contends that he revealed privileged or confidential information to Willett, while Willett testified that he has no recollection that he received any privileged or confidential information from McNeese.

Willett now represents defendant Angela Johnson in this matter, giving rise to concerns about a possible conflict of interest from Willett's "successive representation" of McNeese, a prime witness against Johnson, and Johnson herself, to the potential detriment of Johnson's representation. Furthermore, another member of Johnson's defense team, attorney Thomas Frerichs, initially represented Geoffrey Garrett, McNeese's investigator, on criminal charges against him arising from his alleged burglary of attorney Willett's office in which information pertinent to the criminal prosecution of McNeese was allegedly removed and copied. Finally, it is anticipated that the lead prosecutor in this action, Assistant United States Attorney (AUSA) Patrick Reinert, will be called as a witness in a hearing scheduled for March 15, 2001, on the government's motion regarding the admissibility of McNeese's testimony, in which the government asserts that McNeese's testimony is not the result of a *"Massiah* violation."[2] Johnson has resisted the government's motion, thus suggesting that McNeese was planted by federal authorities in the Benton County Jail to elicit incriminating statements from her without Sixth Amendment protection in violation of *Massiah.* Therefore, the present action presents in real life a factual scenario that might seem too wildly improbable to be presented as a hypothetical situation in an examination question for law students.

### B. Procedural Background

The parties brought their concerns about attorney representation in this mat-

---

1. The defendant is also charged with one count of solicitation of a crime of violence in violation of 18 U.S.C. § 373 and one count of conspiring to commit the substantive offense in violation of 18 U.S.C. § 371, which are also serious offenses.

2. In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court recognized that a defendant is denied the basic protections of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel." *Massiah,* 377 U.S. at 206, 84 S.Ct. 1199.

ter to the court's attention in a joint motion filed on January 10, 2001. Neither party, however, expressly moved to disqualify counsel for the other. In support of the motion, from its perspective, the government filed on January 10, 2001, a Filing Regarding *Ex Parte* Hearing. The government subsequently filed, on January 26, 2001, a Memorandum In Support Of Joint Motion For Hearing On Potential Conflicts Of Interest, and on January 30, 2001, proposed questions to be directed to Robert McNeese in an *ex parte* hearing on representation issues and a Supplemental Memorandum In Support Of Joint Motion On Hearing On Potential Conflicts Of Interest. Defendant Johnson also filed a Memorandum In Regard To Issues Of Attorney Representation on January 26, 2001. That Memorandum was filed by Robert R. Rigg of the Drake University Legal Clinic, who represented Johnson, both on the brief and at the hearing on the joint motion, for the limited purpose of the court's consideration of Johnson's continued representation by attorneys Willett and Frerichs and continued prosecution of this action by AUSA Reinert.[3]

On January 31, 2001, the court held a hearing on the parties' joint motion. By agreement of the parties, the hearing was conducted on the record in open court, with two exceptions. First, the court heard testimony by Robert McNeese, the government's informant, *in camera* and *ex parte,* but on the record, with only Mr. McNeese and his counsel, Mark Meyer, a court reporter, and the undersigned present. Second, the court heard testimony from Alfred Willett, one of defendant Johnson's attorneys, *in camera* and *ex parte,* but on the record, with only Mr. Willett, a court reporter, and the undersigned present.

In the course of the hearing on attorney representation issues, attorney Thomas Frerichs agreed to withdraw from further representation of Angela Johnson, thus

eliminating one thorny issue from the court's consideration, the "successive representation" issue arising from attorney Frerich's initial representation of McNeese's investigator and subsequent representation of defendant Johnson, the person against whom McNeese is likely to testify. However, "successive representation" issues concerning defense counsel Willett and "attorney-as-witness" issues concerning AUSA Reinert remain to be resolved.

Johnson contends that attorney Willett suffers from no disqualifying conflict of interest, because McNeese waived any privilege he might have had concerning his alleged confidential communications with Willett by providing a thorough factual debriefing pursuant to his plea agreement with the government. Moreover, Johnson contends that she has made a knowing and voluntary waiver of any conflict of interest that attorney Willett may have, and that she wishes to have him continue to represent her. However, the government contends that "successive representation" issues continue to taint Willett's representation of Johnson, because, during his debriefing, McNeese disclosed only *underlying facts* concerning his criminal conduct, which does not waive any attorney-client privilege as to McNeese's *communications* with Willett.

As to AUSA Reinert, Johnson contends that Reinert's continued representation of the United States in this case, should he be called as a witness in the course of the hearing on the admissibility of McNeese's testimony, would allow Reinert to play conflicting roles frowned upon under rules of ethical conduct. Specifically, she contends that Reinert should not be allowed to bolster the government's position regarding the legitimacy of McNeese's evidence, by testifying at the hearing on the admissibility of McNeese's testimony, and then be allowed to continue prosecuting

---

**3.** The court appreciates the thoroughness and care with which Mr. Rigg undertook Johnson's representation in this matter, which included the filing of a comprehensive memorandum of law and participation in the hearing, both on very short notice.

this action as an advocate for the government. The government contends, however, that there is no hard-and-fast rule that requires AUSA Reinert's disqualification in this case, and that his appearance as a witness in a preliminary matter before the court, not in the trial before a jury, does not necessarily require his disqualification in this case.

With these facts and arguments in mind, the court turns to resolution of the complicated issues regarding continued participation of defense counsel Willett and AUSA Reinert in the criminal proceedings against Angela Johnson.

## II. LEGAL ANALYSIS

### A. Willett's Continued Representation Of Johnson

#### 1. The concerns and the inquiry

Whether or not defense counsel Willett should be allowed to continue representing Johnson, owing to his prior consultation with a prime witness against her, involves the propriety of "successive representation," which is "where an attorney representing a defendant has previously represented codefendants or trial witnesses." *See United States v. Agosto,* 675 F.2d 965, 970 (8th Cir.1982). Such a situation implicates the standards for professional and ethical conduct of attorneys with regard to attorney-client privilege arising from the prior representation. *See, e.g.,* Iowa Code of Professional Responsibility DR–101,[4] *see also Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1154 (8th Cir.1999) (civil case examining conflict of interest issues in federal court in light of rules of professional conduct adopted by the state supreme court

where the federal district court had followed those state rules). Moreover, and perhaps even more importantly, it potentially impinges upon a criminal defendant's Sixth Amendment right to counsel. *See Agosto,* 675 F.2d at 969–70. Thus, in assessing the merits of a disqualification motion in such circumstances, the Eighth Circuit Court of Appeals has explained that the court must balance " 'individual constitutional protections, public policy and public interest in the administration of justice, and basic concepts of fundamental fairness.' " *Id.* at 970 (quoting *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975)).

Although this court is not presented with an express demand by the government for disqualification of attorney Willett from further representation of Angela Johnson, the court recognizes that the practical impact of its consideration of the parties' joint motion on issues of attorney representation is that the court must determine whether attorney Willett should be disqualified from further representation of Angela Johnson in this case. Thus, the standards for "disqualification motions" articulated in *Agosto* are applicable here.

Moreover, in *Agosto,* the Eighth Circuit Court of Appeals also concluded that its "scope of review is limited":

As we stated in *Coffelt v. Shell,* 577 F.2d [30,] 32 [ (8th Cir.1978) ]:

In matters concerning the supervision of members of its bar, "the finding of the district court will be upset only upon a showing that abuse of discretion has taken place." *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d [602,] 605 [ (8th Cir.1977), *cert. denied,*

---

4. Subsection (A) of this disciplinary rule defines "confidence" as "information protected by the attorney-client privilege under applicable law," and "secret" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Subsection (B) of this disciplinary rule provides, in pertinent part, as follows:

[E]xcept when permitted under DR 4–101(C), a lawyer shall not:

(1) Reveal a confidence or secret of his client.
(2) Use a confidence or secret of his client to the disadvantage of the client.
(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

Iowa Code of Professional Responsibility, DR 4–101(B).

436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978) ], quoting *Hull v. Celanese Corp.*, 513 F.2d [568,] 571 [ (2d Cir.1975) ]. "Moreover, in the disqualification situation, any doubt is to be resolved in favor of disqualification." *Hull v. Celanese Corp., supra*, 513 F.2d at 571.

*Agosto*, 675 F.2d at 970. Thus, the court's resolution of disqualification issues here is a matter of discretion, albeit discretion guided by the principle that any doubts should be resolved in favor of disqualification. *See id.; see also Petrovic*, 200 F.3d at 1154 (civil case in which the court observed, " 'The decision to grant or deny a motion to disqualify an attorney rests in the discretion of the [district] court, and we will reverse this determination only upon a showing of an abuse of discretion.' ") (quoting *Harker v. Commissioner of Internal Revenue*, 82 F.3d 806, 808 (8th Cir.1996)); *United States v. Register*, 182 F.3d 820, 828 (11th Cir.) (criminal case in which the court observed, "We review a district court's decision to disqualify a defendant's attorney due to a conflict of interest for abuse of discretion.") (citing *Wheat v. United States*, 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), and *United States v. Ross*, 33 F.3d 1507, 1522 (11th Cir.1994), *cert. denied*, 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995)), *cert. denied,* ─── U.S. ───, 120 S.Ct. 2703, 147 L.Ed.2d 973 (1999), *and cert. denied,* ─── U.S. ───, 121 S.Ct. 123, 148 L.Ed.2d 78 (2000); *United States v. Millsaps*, 157 F.3d 989, 995 (5th Cir.1998) ("A district court's disqualification of a defense attorney [in a criminal case] for conflict of interest is reviewed for abuse of discretion.").

 The impingement upon a defendant's constitutional rights in a "successive representation" case arises from a conflict of interest between the prior client and the present client. *See Agosto*, 675 F.2d at 970–71; *see also Wood v. Georgia*, 450 U.S. 261, 277, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right

to representation that is free from conflicts of interest.") (citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and *Holloway v. Arkansas*, 435 U.S. 475, 481, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)); *United States v. Flynn*, 87 F.3d 996, 1001 (8th Cir.1996) ("Counsel breaches the duty of loyalty to a client when burdened with an actual conflict of interest".) [*Strickland v. Washington*, 466 U.S. 668], 692, 104 S.Ct. at 2067, 80 L.Ed.2d 674 [ (1984) ]. Prejudice is presumed if a defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Id.*, citing *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)."). Although "[m]ost conflict of interest issues in criminal cases are raised at the post-conviction stage," this court, like the court in *Agosto*, is "concerned with the power of the district court to disqualify counsel *before* conflict results in ineffective assistance of counsel." *Agosto*, 675 F.2d at 970 (emphasis in the original).

In *Agosto*, the court pointed out that "[a]t this stage in the proceedings, there is of necessity less certainty as to whether conflicts will actually arise and as to the nature of those conflicts." *Id.; see also Register*, 182 F.3d at 829–30 (a court does not have to find direct evidence of an actual conflict of interest to disqualify defense counsel in a criminal case, and instead should consider whether there has been a " 'showing of a serious potential for conflict,' " which may be based on circumstantial evidence) (quoting *Wheat*, 486 U.S. at 164, 108 S.Ct. 1692). Consequently, "[b]ecause the task of assessing the potential for conflict well in advance of trial is such a difficult one, the standards applicable to making that assessment must be flexible." *Id.; see also Flynn*, 87 F.3d at 1001 ("A trial court has flexibility in making the difficult assessment of the potential for conflict.") (citing *Agosto*, 675 F.2d at 970).

In *Agosto*, the court found the requisite flexibility for pretrial evaluation of con-

flicts of interest in "successive representation" cases in the last sentence of Rule 44(c) of the Federal Rules of Criminal Procedure. *Id.* The pertinent portion of Rule 44(c) states, "Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel." FED.R.CRIM.P. 44(c) (last sentence). The court in *Agosto* read Rule 44(c) to require "that in cases of multiple representation [where an attorney simultaneously represents two or more defendants], the district court shall conduct an inquiry prior to trial to determine the potential for conflicts of interest." *Agosto*, 675 F.2d at 970 (with insertions by that court). The court found the rule to be applicable to "successive representation" cases, even though it was constructed for "multiple representation" cases, because it "also establishes a suitable framework for the district court's exercise of responsibility in assessing possible conflicts here." *Id.* & n. 3 (limiting adoption of Rule 44(c) in the circumstances of "successive representation" to the last sentence of the rule). "Thus, the first inquiry is whether there is good cause to believe that a conflict of interest is likely to arise." *Id.* at 971. Although "[t]here is no affirmative duty to hold a hearing on the possibility of conflicts in all cases of successive representation," *see Flynn*, 87 F.3d at 1001 (citing *Agosto*, 675 F.2d at 970 n. 3), this court conducted a hearing on the parties' joint motion on issues of attorney representation as part of its inquiry into whether there is good cause to believe that a conflict of interest is likely to arise in the present case.

### 2. Is a conflict of interest likely to arise?

In *Agosto*, the Eighth Circuit Court of Appeals identified potential sources of con-

flict of interest in "successive representation" of a witness and the accused:

In the successive representation situation, privileged information obtained from the former client might be relevant to cross-examination, thus affecting advocacy in one of two ways:

(a) the attorney may be tempted to use that confidential information to impeach the former client; or

(b) counsel may fail to conduct a rigorous cross-examination for fear of misusing his confidential information.

*United States v. Jeffers*, 520 F.2d 1256, 1264–1265 (7th Cir.1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976). The second major possibility of conflict in the successive representation situation is that the attorney's pecuniary interest in possible future business may cause him to make trial decisions with a view toward avoiding prejudice to the client he formerly represented. *Id.*

*Agosto*, 675 F.2d at 971. In *United States v. Flynn*, 87 F.3d 996 (8th Cir.1996), the court again noted that "[a]n example [of a conflict of interest in a 'successive representation' case] may be where counsel's cross-examination of a former client is impeded for fear of misusing confidential information." *Flynn*, 87 F.3d at 1001 (citing *Agosto*, 675 F.2d at 971).[5]

However, in *Flynn*, the court also noted that, "[i]n determining whether a conflict of interest exists, substantial weight is given to defense counsel's representations." *Flynn*, 87 F.3d at 1001 (citing *Agosto*, 675 F.2d at 972). Moreover,

[t]he mere fact that a trial lawyer had previously represented a prosecution witness does not entitle a defendant to [post-conviction] relief. *Simmons [v. Lockhart]*, 915 F.2d [372,] 378 [ (8th

---

5. *Flynn* is a case involving an "ineffective assistance of counsel" claim premised on "successive representation" that was raised for the first time in a petition for post-conviction relief under 28 U.S.C. § 2255. *Flynn*, 87 F.3d at 999. Thus, that case considered "suc-

cessive representation" issues, and consequent potential for a conflict of interest, in the post-conviction context in which the court in *Agosto* had recognized that most conflict of interest issues in criminal cases are raised. *See Agosto*, 675 F.2d at 970.

Cir.1990) ]. The defendant must show that this successive representation had some actual and demonstrable adverse effect on the case, not merely an abstract or theoretical one. *Id.*

*Flynn,* 87 F.3d at 1001.

Thus, the import of *Flynn* and *Agosto* here is threefold: These decisions demonstrate that (1) the concern, for Johnson's case, is whether Willett's "successive representation" of McNeese and Johnson will have, or has a serious potential to have, some "actual and demonstrable adverse effect" on Johnson's case, not merely an abstract or theoretical one; (2) the primary example of such an "actual and demonstrable adverse effect" would be where Willett's cross-examination of McNeese will be, or potentially will be, impeded because he had knowledge of confidential information gained from his interview with McNeese; and (3) the court has flexibility in making the assessment of the *potential* for such conflict. *Flynn,* 87 F.3d at 1001; *Agosto,* 675 F.2d at 970–71; *see also Dawan v. Lockhart,* 31 F.3d 718, 721–22 (8th Cir.1994) (*habeas* case); *Salam v. Lockhart,* 874 F.2d 525, 527–28 (8th Cir.) (*habeas* case), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 202 (1989); *Cheek v. United States,* 858 F.2d 1330, 1337–38 (8th Cir.1988) (§ 2255 case).

### a. Were any confidences imparted to defense counsel by the witness?

■ Again, "[t]he mere fact that a trial lawyer had previously represented a prosecution witness does not entitle a defendant to [post-conviction] relief," *Flynn,* 87 F.3d at 1001, nor does it necessarily demonstrate that defense counsel must be disqualified, before trial, from continuing to represent a criminal defendant. *See Agosto,* 675 F.2d at 972 (ultimately concluding that defense counsel's former representation of grand jury witnesses "presents the very remote possibility of a conflict, insufficient to warrant the disqualification of defendant Gustafson's attorney of choice"). Rather, the defendant must show that this successive representation had some actual and demonstrable adverse effect on the

case, or a serious potential for such an effect, not merely an abstract or theoretical one. *Id.; see also Flynn,* 87 F.3d at 1001. Thus, for there to be any conflict of interest in the circumstances presented here, McNeese must have imparted to attorney Willett some matter that comes within attorney-client privilege. *See, e.g.,* Iowa Code of Professional Responsibility DR 4–101(A) (defining "confidences" and "secrets" to which attorney-client privilege attaches).

■ Although McNeese and Willett disagree on whether any such confidences were imparted in the course of the one-hour interview between them, after which Willett did not undertake to represent McNeese, "[i]n determining whether a conflict of interest exists, substantial weight is given to defense counsel's representations." *Flynn,* 87 F.3d at 1001 (citing *Agosto,* 675 F.2d at 972). The court chooses to adopt attorney Willett's characterization of the interview with McNeese, and thus concludes, as an initial matter, that there is simply no conflict of interest that must be remedied in Willett's successive representation of McNeese and Johnson, because there is no risk that attorney-client privileged information could be implicated in the course of Willett's cross-examination of McNeese on Johnson's behalf. However, in an abundance of caution, the court will also consider whether any privilege, if it ever attached, has been waived, and whether any potential conflict of interest can be adequately remedied.

### b. Did the witness waive any privilege by debriefing?

■ Assuming, for the sake of argument, that there were some confidences imparted to attorney Willett by McNeese to which attorney-client privilege could have attached, and hence, that there may have been some potential for a conflict of interest, Johnson contends that there is now no such potential, because McNeese, the previously represented witness, has waived any attorney-client privilege that

attached to his consultation with attorney Willett, Johnson's current defense counsel. Johnson contends that McNeese's waiver occurred when McNeese subsequently disclosed all of the underlying facts that were (or might have been) revealed to attorney Willett during the prior consultation in the course of his debriefing pursuant to his plea agreement with the United States. The government contends, however, that in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court distinguished between disclosure of *underlying facts* and waiver of attorney-client privilege concerning *communications*. Because only underlying facts were revealed in McNeese's debriefing, the government contends, the attorney-client privilege still attaches to McNeese's communications with attorney Willett, and a "live" conflict of interest arising from "successive representation" still exists in this case.

The government is correct that in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court distinguished between disclosure of *underlying facts* and disclosure of privileged *communications*. In *Upjohn*, the Court concluded that allowing attorney-client privilege to stand as a bar to discovery concerning privileged matters would not impede discovery of the *underlying facts*, which could be obtained directly from the witnesses involved without recourse to any protected communications:

> Application of the attorney-client privilege to communications such as those involved here, however, puts the adversary in no worse position than if the communications had never taken place. The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney:
>
> > "[T]he protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write

to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *City of Philadelphia v. Westinghouse Electric Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962).

> See also *Diversified Industries, [Inc. v. Meredith]*, [572 F.2d 596,] 611 [ (8th Cir.1978) (*en banc* ) ]; *State ex rel. Dudek v. Circuit Court*, 34 Wis.2d 559, 580, 150 N.W.2d 387, 399 (1967) ("the courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer"). *Here the Government was free to question the employees who communicated with Thomas and outside counsel.* Upjohn has provided the IRS with a list of such employees, and the IRS has already interviewed some 25 of them. While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney-client privilege. As Justice Jackson noted in his concurring opinion in *Hickman v. Taylor*, 329 U.S., at 516, 67 S.Ct., at 396: "Discovery was hardly intended to enable a learned profession to perform its functions ... on wits borrowed from the adversary."

*Upjohn Co.*, 449 U.S. at 395–96, 101 S.Ct. 677 (emphasis added). Thus, *Upjohn* clearly distinguished between disclosure of underlying facts from a source different from the privileged communications—in that case, via questioning of the witnesses themselves—and disclosure of the privileged communications. The decision highlighted this difference, as well, in the quotation from *Westinghouse*, by noting the practical difference between a question going to *facts* and one that impinged on the privilege by asking, "What did you say or write to the attorney?" *Id.* (quoting *Diversified Industries*, 572 F.2d. at 611, in

turn quoting *Westinghouse Electric Corp.*, 205 F.Supp. at 831).

Subsequent decisions of the Eighth Circuit Court of Appeals have recognized this distinction. In *PaineWebber Group v. Zinsmeyer Trusts Partnership*, 187 F.3d 988 (8th Cir.1999), *cert. denied*, 529 U.S. 1020, 120 S.Ct. 1421, 146 L.Ed.2d 313 (2000), the Eighth Circuit Court of Appeals relied on *Upjohn* to distinguish between information about "underlying facts" that came into evidence from a separate source and evidence that might have come from privileged documents. *See PaineWebber Group*, 187 F.3d at 994. Specifically, the court concluded that the privileged documents (which were not admitted, because the arbitrators did not overrule PaineWebber's claims of privilege) "appear to add little to the evidence presented during the thirty-eight-day hearing regarding Reik's trading activities and PaineWebber's investigation of those activities." *Id.* The court concluded that the parties attacking the privilege had shown a "lack of interest in obtaining and presenting" evidence of underlying facts that had been apparent to them. *Id.* at 995. Similarly, in *In re Bieter Co.*, 16 F.3d 929 (8th Cir.1994), the Eighth Circuit Court of Appeals again relied on *Upjohn* to distinguish between "inconvenience" in discovery, from inability to obtain discovery concerning privileged communications, and the ability of the party to obtain information about underlying facts from another source. *Bieter*, 16 F.3d at 941. The court concluded, based on the scope of discovery, that "the respondents have already learned whatever might be revealed were we to find the privilege inapplicable, but if not, it is simply due to their own failure to ask the proper questions." *Id.* Thus, these decisions suggest that McNeese's disclosure of underlying facts does not dissolve the attorney-client privilege that might attach to his communications with attorney Willett.

Other Circuit Courts of Appeals have addressed more directly whether any *waiver* of a privilege occurs when *underlying facts* are disclosed, again relying on

*Upjohn.* Thus, in *United States v. Rakes*, 136 F.3d 1 (1st Cir.1998), the First Circuit Court of Appeals noted that "[t]he waiver issue is more complicated" than the question of whether disclosure of facts had occurred. *See Rakes*, 136 F.3d at 5. The court reiterated that "the privileged communication and the facts recounted within it are two different things." *Rakes*, 136 F.3d at 5 (citing *Upjohn*, 449 U.S. at 395, 101 S.Ct. 677). "Thus, a client does not normally lose the privilege as to communications with his attorney merely because he testifies at trial to the same events discussed with his lawyer." *Id.* The court also found that "there is no suggestion that Stephen Rakes ever told Burkes or anyone else about his *communications* with Julie or with attorney Sullivan." *Id.* (emphasis in original).

Furthermore, in *Rakes*, although the court noted that, in very limited circumstances, it had found that a disclosure of facts might be so complete as to defeat a claim of privilege, the case before it was "not remotely comparable." *Id.* The court compared the case before it to the situation in *United States v. Billmyer*, 57 F.3d 31 (1st Cir.1995), in which the court found that the "peculiar circumstances" constituting a waiver were the following: "[T]he information had been collected by the attorney for the client and then voluntarily disclosed in full by the client to the government; the issue was whether this same information, already possessed by the government, should also be made available to third parties whom the government was prosecuting." *Rakes*, 136 F.3d at 5. In *Rakes*, however, the court found different circumstances required a different conclusion:

> The communications by Stephen Rakes to his wife and attorney apparently contained much that was not disclosed to Burke, whom the government can always call as a witness. Nor, in contrast to *Billmyer*, is Rakes making a disclosure to the government while trying to withhold the information from defen-

dants whom the government is trying to prosecute. *Billmyer* is the exception, and we have no trouble letting the camel's nose into the tent without letting in the camel....

... We simply agree with the district court that the suppressed communications were originally privileged, and that there was no later loss of the privilege as claimed by the government.

*Rakes,* 136 F.3d at 5–6.

Here, as in *Rakes,* McNeese made disclosures to the government, but did not do so while attempting to prevent disclosure of the information to the present defendant. *See id.* at 6. Furthermore, McNeese contends that he had confidential communications with attorney Willett and there is no indication that McNeese ever told anyone else about those *communications. See id.* at 5–6. Thus, McNeese's supposedly full disclosure of underlying facts in his debriefing did not "waive" his attorney client privilege, because the circumstances here instead fall more nearly within the general rule that "a client does not normally lose the privilege as to communications with his attorney merely because he testifies at trial to the same events discussed with his lawyer." *See id.* at 5. In both the "trial testimony" and "debriefing" scenarios, the fact that an independent source of information may be accessible to Johnson's defense team for the purposes of cross-examining McNeese does not waive McNeese's attorney-client privilege, because nothing suggests that McNeese's debriefing included an answer to the question, "What did you tell Mr. Willett?," where privileged communications and the facts disclosed in such communications are two different things. *See Upjohn,* 449 U.S. at 395–96, 101 S.Ct. 677; *Paine-Webber Group,* 187 F.3d at 994; *Rakes,* 136 F.3d at 5. Thus, attorney Willett is in no worse position, even assuming he is in possession of privileged information, than any other defense counsel would be, in terms of conducting an effective cross-examination of McNeese, because he has access to an independent source of factual information upon which he can draw to conduct an effective cross-examination of McNeese without any fear or temptation to draw upon privileged communications. *See Upjohn Co.,* 449 U.S. at 395–96, ·101 S.Ct. 677 (noting that the party seeking disclosure of privileged communications was in "no worse position than if the communications had never taken place," where that party had access to an independent source for the information believed to be contained in those communications).

In short, the court concludes that there has been no waiver by McNeese of his attorney-client privilege regarding communications with attorney Willett—assuming any privileged communications were made to attorney Willett, contrary to the court's finding above—so that, again assuming that privileged communications occurred, there is the potential of a conflict of interest in Willett's "successive representation" of McNeese and Johnson.

### c. Is any potential conflict of interest sufficiently "serious"?

■ However, the question is not whether *any* potential conflict of interest exists, but "whether there is good cause to believe that a conflict of interest is *likely* to arise," *see Agosto,* 675 F.2d at 971 (emphasis added), that is, whether there has been a "showing of a *serious* potential for conflict." *Wheat,* 486 U.S. at 164, 108 S.Ct. 1692 (emphasis added); *see also Flynn,* 87 F.3d at 1001 (considering, in the post-conviction relief context, whether "an actual conflict of interest adversely affected his lawyer's performance," not merely an "abstract or theoretical" adverse effect). Thus, in *Agosto,* the Eighth Circuit Court of Appeals rejected the district court's conclusion that there was "a strong possibility of conflict on the basis of confidential information imparted to [the attorney] during the course of his representation of the grand jury witnesses," and instead concluded that the district court had improperly applied an irrefutable presumption that confidences were disclosed, and held that "at most [the attorney's] former rep-

resentation of grand jury witnesses present[ed] the very remote possibility of a conflict, insufficient to warrant the disqualification of defendant Gustafson's attorney of choice." *Id.* at 971–72.

Here, the court finds that there is no realistic possibility that any of the sources of a potential conflict of interest affecting advocacy identified by the Eighth Circuit Court of Appeals in *Agosto* will occur in this case. *See id.* at 970. The first concerns are that attorney Willett may be tempted to use confidential information to impeach McNeese or fail to conduct a rigorous cross-examination for fear of misusing his confidential information. *Id.* There should be no such fear or temptation here, however, for the very reason that McNeese has provided an independent source of *factual* information, which is available to attorney Willett for the purposes of cross-examining McNeese, in the form of his debriefing pursuant to his plea agreement. *See Upjohn,* 449 U.S. at 395–96, 101 S.Ct. 677 (distinguishing between disclosure of underlying facts and disclosure of confidential communications). Thus, attorney Willett can draw upon this independent source of factual information to pursue a vigorous cross-examination without fear of disclosing confidential information and without any temptation to do so. *See Agosto,* 675 F.2d at 971 (identifying these concerns). The court knows attorney Willett to be a vigorous cross-examiner, and has no fear that he will be limited in his ability to perform that essential function on Johnson's behalf as the result of his knowledge of McNeese's purported confidences—which, again, the court has found were not imparted to him.

Nor can the court reasonably foresee that attorney Willett's cross-examination would be impeded by his "pecuniary interest in possible future business," which might "cause him to make trial decisions with a view toward avoiding prejudice to the client he formerly represented." *Agosto,* 675 F.2d at 971. Willett never accepted representation of McNeese in the first instance and had no other contact with McNeese aside from the one-hour

meeting after which he declined to represent McNeese. Also, McNeese is currently serving a life sentence and is already represented by counsel. Thus, there is no reasonably foreseeable possibility that McNeese would ever approach Willett about legal representation, let alone any reasonably foreseeable possibility that Willett would agree to represent McNeese, after McNeese allegedly authorized his investigator, Garrett, to burglarize Willett's office.

Thus, as in *Agosto,* the court concludes that there is, at most, only "the very remote possibility of conflict, insufficient to warrant the disqualification of defendant [Johnson's] attorney of choice." *Agosto,* 675 F.2d at 972.

### 3. Remedying any potential conflict

Assuming, for the sake of argument, that there is nevertheless "good cause to believe that a conflict of interest is likely to arise," the court's "next inquiry" is whether the court can make an "appropriate response." *Id.* at 971 (the court must first evaluate "whether there is good cause to believe that a conflict of interest is likely to arise," and, "[i]f so, the next inquiry is whether the district court made the appropriate response"). In *Agosto,* when the Eighth Circuit Court of Appeals adapted Rule 44(c) of the Federal Rules of Criminal Procedure, which pertains to "multiple representation," to the circumstances of "successive representation," the court concluded that the rule indicated that the court's "chosen method for dealing with a potential conflict, in the absence of an acceptable waiver, is the one which will alleviate the effects of the conflict while interfering the least with defendant's choice of counsel." *Agosto,* 675 F.2d at 970; *see also Flynn,* 87 F.3d at 1001 (quoting *Agosto* ). This statement strongly suggests that an "acceptable waiver" by the defendant potentially threatened by a conflict of interest from "successive representation," in this case, Johnson, would itself constitute a sufficient remedy of any po-

tential conflict. Therefore, this court will consider first whether Johnson has made an "acceptable waiver" of any conflict of interest arising from attorney Willett's prior consultation, in unrelated proceedings, with one of the prime witnesses against her.

### a. Has Johnson made an "acceptable waiver" of any conflict?

As the court in *Agosto* indicated, any waiver of a conflict of interest must be "knowing and intelligent." *See Agosto*, 675 F.2d at 969–70 (citing *Holloway v. Arkansas*, 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). Whether a waiver is knowing and voluntary (or intelligent) is based on an examination of the facts, including such things as whether "the district court advised [the defendant] of the potential conflict and the dangers of proceeding with [chosen] counsel; and that [the defendant] knowingly, voluntarily, and intelligently waived his right to have an attorney unburdened by a potential conflict represent him [in the proceedings]." *See United States v. Ayd*, 25 F.3d 624, 627 (8th Cir.1994); *see also United States v. Reed*, 179 F.3d 622, 626 (8th Cir.1999) (finding a knowing and voluntary waiver of a potential conflict of interest where the defendant was "well aware" of the circumstances giving rise to a potential conflict, but had not complained about them, and in fact had concealed them, for several years after his trial).

In the present case, the court finds that Johnson has made a knowing and intelligent waiver of any conflict of interest that attorney Willett may have as the result of his prior contact with witness McNeese. At the hearing, Johnson's independent attorney for those proceedings, Mr. Rigg, questioned Johnson extensively concerning her desire to waive any conflict of interest that attorney Willett might have. Thereafter, the court made its own inquiries of Johnson regarding her waiver. *See Ayd*, 25 F.3d at 627 (considering whether "the district court advised [the defendant] of the potential conflict and the dangers of proceeding with [chosen] coun-

sel" and the defendant thereafter made a knowing, voluntary, and intelligent waiver fully aware of the circumstances). The court is satisfied, following the hearing, and from the fact that defendant Johnson was represented by independent counsel at the hearing and in the briefing of her arguments for the hearing, that defendant Johnson has a clear understanding of the circumstances, the potential for a conflict of interest, and any potential effect upon her representation, and nevertheless wishes to have attorney Willett continue to represent her. *Id.; Agosto*, 675 F.2d at 969–70. Thus, the court concludes that defendant Johnson has made a knowing, voluntary, and intelligent waiver of her Sixth Amendment right to proceed with counsel unburdened by any potential conflict of interest. Therefore, the court finds an "acceptable waiver," constituting an adequate response, in and of itself, to the potential conflict of interest of attorney Willett in this case. *See Agosto*, 675 F.2d at 970 (considering whether the court adopted an appropriate method to alleviate the effects of a conflict "in the absence of an acceptable waiver").

### b. Is a further remedy required?

The decisions of the Eighth Circuit Court of Appeals in *Agosto* and *Flynn* hold that, in the absence of an acceptable waiver, the court may choose a method for dealing with the potential conflict that "will alleviate the effects of the conflict while interfering the least with [Johnson's] choice of counsel." *Agosto*, 675 F.2d at 970–71; *see also Flynn*, 87 F.3d at 1001 (citing *Agosto* ). Assuming, for the sake of argument, that Johnson's waiver is not entirely effective, and believing that, even in the presence of an effective waiver, the court should make all reasonable efforts to ensure that Johnson's prosecution is not infected by a conflict of interest on the part of her defense counsel, the court deems it appropriate to invoke additional measures—or at least to consider further whether attorney Willett should be disqualified, notwithstanding Johnson's waiv-

er of any conflict of interest on his part. *See, e.g., Wheat,* 486 U.S. at 160, 108 S.Ct. 1692 (the trial court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," and thus, the court may override a defendant's waiver of his counsel's conflict of interest); *United States v. Messino,* 181 F.3d 826, 830 (7th Cir.1999) (reading Fed.R.Crim.P. 44(c) and *Wheat,* 486 U.S. at 163, 108 S.Ct. 1692, to give district courts "broad discretion to fashion remedies to avoid conflicts of interest," even if the defendant is willing to waive the conflict).

Some guidance can be found in the standard applied by the Second Circuit Court of Appeals in *United States v. Kliti,* 156 F.3d 150 (2d Cir.1998). In *Kliti,* the court held that if, after an inquiry into the existence of an actual or potential conflict of interest, the court finds that "the conflict is so severe that no rational defendant would waive it, the court must disqualify the attorney." *Kliti,* 156 F.3d at 153. "If it is a lesser conflict," the court in *Kliti* continued, "the court must conduct a ... hearing to determine whether the defendant will knowingly and intelligently waive his right to conflict-free representation." *Id.* This court concluded above that Johnson's waiver of any conflict was knowing and intelligent; therefore, the court must consider whether the potential conflict here is nevertheless "so severe that no rational defendant would waive it." *Id.; see also United States v. Lanoue,* 137 F.3d 656, 663 (1st Cir.1998) ("A district court can disqualify a defendant's attorney [in a criminal case] over that defendant's objection where it finds either an actual conflict or a serious potential conflict.").

In this case, the court found above, in the first instance, that no conflict of interest existed, because McNeese did not impart any confidential matters to attorney Willett, which would give rise to a conflict of interest between Willett's present representation of Johnson and attorney-client privilege attached to his prior contact with McNeese. The court also held above, in the alternative, that *if* any conflict of interest existed, there was only "the very remote possibility of conflict, insufficient to warrant the disqualification of defendant [Johnson's] attorney of choice." *Agosto,* 675 F.2d at 972. In these circumstances, the court cannot find that there is any conflict of interest "so severe that no rational defendant would waive it," such that "the court must disqualify the attorney." *Kliti,* 156 F.3d at 153. Because attorney Willett was court-appointed, not independently retained by Johnson, the court recognizes that defendant Johnson's desire to be represented by attorney Willett may weigh somewhat less significantly in the balance of interests the court must consider in the pretrial evaluation of potential conflicts of interest in this "successive representation" case. *See Agosto,* 675 F.2d at 970 (noting the interests that must be balanced in this context, including the defendant's choice of counsel, citing *Garcia,* 517 F.2d at 272). Nevertheless, attorney Willett has been involved in this case almost from the beginning. Johnson was indicted on July 26, 2000, and attorney Willett was appointed and appeared on her behalf on August 1, 2000. Thus, Johnson has an established working relationship with attorney Willett, developed over several months, and Johnson has expressed her desire that Willett continue to represent her in this case. Johnson's desire to waive any potential conflict of interest on the part of attorney Willett is altogether rational, in light of what the court finds to be, at most, a remote possibility of a conflict of interest and the nature of her relationship with counsel.

Nevertheless, to ensure that there is no realistic opportunity that what the court finds is, at most, a remote possibility of a conflict of interest could blossom into an actual conflict of interest in the course of trial, with adverse consequences to Johnson, the court chooses the following methods to respond, in the circumstances presented. *See Agosto,* 675 F.2d at 971. The court is now fully apprised of the circumstances that might give rise to any conflict of interest in this case. Therefore, in the

unlikely event that attorney Willett subsequently recalls some matter from his contact with witness McNeese that could provide some basis for concern about violating attorney-client privilege in the course of his cross-examination of that witness, he must bring that concern to the court's attention in a written *ex parte* filing, under seal, and must demonstrate that he can proceed on the basis of *factual* information drawn from an independent source, such as McNeese's debriefing. Similarly, if necessary, Willett may consult with the court by written *ex parte* filing, under seal, for guidance on any other matter concerning a potential conflict of interest arising from his prior contact with witness McNeese. The court will respond to such inquires by written *ex parte* order, filed under seal. The court does not intend—and does not believe—that these measures should, in any way, chill attorney Willett from zealously representing defendant Johnson, but should instead facilitate such zealous representation, without prejudicing the government. Attorney Willett is also prohibited from disclosing to other defense counsel any confidential matters from, or any other details regarding, his one-hour consultation with McNeese. Defendant Johnson and attorney Willett are also free to assign to other counsel any cross-examination of McNeese. Finally, circumstances may present themselves under which either attorney Willett or the court deems it appropriate for Willett to withdraw from representation of Johnson in this matter. Therefore, the court may revisit the question of attorney Willett's continued representation of Johnson, either on a motion of one of the parties, or upon its own motion, after the hearing on the admissibility of McNeese's testimony and allegations of a "Massiah violation."[6]

### B. Reinert's Continued Representation Of The United States

The propriety of AUSA Reinert's continued representation of the United States, which is also called into question in the parties' joint motion on issues of attorney representation, is premised on different concerns than the question about attorney Willett's continued representation of Johnson. Angela Johnson contends that McNeese's testimony arises from a *"Massiah* violation," based on her allegation that McNeese was planted by federal authorities in the Benton County Jail to elicit incriminating statements from her without Sixth Amendment protection. It is expected that, in the hearing on the admissibility of McNeese's testimony, scheduled for March 15, 2001, AUSA Reinert may be called as a witness concerning the government's contacts with McNeese prior to Johnson's alleged disclosures of inculpatory information to McNeese while both were incarcerated in the Benton County Jail. Thus, the issue regarding AUSA Reinert is whether the "attorney-witness rule" requires his disqualification.

Johnson contends that Reinert should not be allowed to play conflicting roles as a witness and advocate in the proceedings against her. The government contends, however, that AUSA Reinert's appearance as a witness in a preliminary matter before the court, not in the trial before a jury, does not necessarily require his disqualification in this case. The government asserts that the hearing on the admissibility of McNeese's testimony and the trial are, or should be regarded as, separate proceedings, and that the government will be represented by other counsel during that hearing, so that AUSA Reinert will not appear as witness and advocate in the same proceedings or appear to vouch for his own credibility in argument to the court. The government also asserts that the hearing and the trial will be heard by different triers of fact, the court in the first instance, and the jury in the second, so that the ethical concerns that might otherwise arise if a lawyer becomes a wit-

---

6. The court is not unmindful that attorney Willett is only one member of Johnson's defense team, so that his withdrawal or disquali-

fication at some later date would not necessarily impose the kind of prejudice that would arise if Johnson had no other counsel.

ness are significantly mitigated or eliminated.

### 1. Applicable principles

Both parties recognize that certain provisions of the Iowa Code of Professional Responsibility, embodying the "attorney-witness rule," are implicated when a prosecutor may appear as a witness at a pretrial hearing regarding the admissibility of evidence. First, the parties draw the court's attention to DR 5–10, which provides, as follows:

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a member of the firm ought to be called as a witness on behalf of the client, the lawyer shall withdraw from the conduct of the trial and the firm, if any, shall not continue representation in the trial, except that the representation may continue and the lawyer or member of the firm may testify in the circumstances enumerated in DR 5–101(D)(1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or member of the firm may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client.

Iowa Code of Professional Responsibility DR 5–102. The exceptions to DR 5–102(A), which are enumerated in DR 5–101(D) are as follows:

(D) A lawyer shall not accept employment in contemplated or pending litigation if it is known or it is obvious that a member of the lawyer's firm ought to be called as a witness, except that the employment may be undertaken and the lawyer or a member of the firm may testify:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or the firm as counsel in the particular case.

Iowa Code of Professional Responsibility DR 5–101(D). Further, the government points out that the ethical concerns these rules serve are stated in EC 5–9, which states the following:

Occasionally a lawyer is called upon to decide in a particular case whether the lawyer will be a witness or an advocate. If a lawyer is both counsel and witness, the lawyer becomes more easily impeachable for interest and thus may be a less effective witness. Conversely the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing the lawyer's own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

Iowa Code of Professional Responsibility EC 5–9.

One of the few authorities that addresses the situation in which, for some reason, a federal prosecutor is called or likely to be called as a witness in a pretrial hearing in a criminal case is *United States v. Johnston*, 690 F.2d 638 (7th Cir.1982). In that case, the Seventh Circuit Court of Appeals first identified ethical concerns surrounding the "advocate-witness rule" identical to those identified in the Iowa Code of Professional Responsibility. *See Johnston*, 690 F.2d at 642 (citing the ABA Code of

Professional Responsibility, which is the basis for the Iowa Code of Professional Responsibility). The court then noted that, in *United States v. Birdman,* 602 F.2d 547 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980), the Third Circuit Court of Appeals had identified four policies said to be served by the "advocate-witness rule":

> First, the rule eliminates the risk that a testifying prosecutor will not be a fully objective witness given his position as an advocate for the government. Second, there is fear that the prestige or prominence of a government prosecutor's office will artificially enhance his credibility as a witness. Third, the performance of dual roles by a prosecutor might create confusion on the part of the trier of fact as to whether the prosecutor is speaking in the capacity of an advocate or of a witness, thus raising the possibility of the trier according testimonial credit to the prosecutor's closing argument. Fourth, the rule reflects a broader concern for public confidence in the administration of justice, and implements the maxim that "justice must satisfy the appearance of justice." This concern is especially significant where the testifying attorney represents the prosecuting arm of the federal government.

*Johnston,* 690 F.2d at 643 (citing *Birdman,* 602 F.2d at 553–55) (footnote omitted). In addition, the court in *Johnston* recognized additional considerations with regard to United States Attorneys:

> United States Attorneys are expected to adhere to the highest standards of professional behavior and to be worthy of public trust and confidence. Nevertheless, the United States Attorney who becomes both witness and advocate runs the risk of impeachment or otherwise being found not credible by the district judge. That would be an unfortunate situation for government counsel which could impair not only continuation as an effective advocate in the case, but could also produce lingering adverse after effects.

*Johnston,* 690 F.2d at 643. Having found no case in which the issue had arisen in a pretrial suppression hearing, where the witness prosecutor intended to participate in the subsequent jury trial, the court read the general rule from other cases to be that the situation should be avoided if possible, "but counsel's testimony will be permitted in extraordinary circumstances and for compelling reasons, usually where the evidence is not otherwise available." *Id.* at 643–44. However, the court noted, "[i]n those circumstances, it is often suggested ... that counsel withdraw from further participation in the case." *Id.* at 644.

Next, the court in *Johnston* rejected the government's argument, somewhat similar to an argument offered here, that the "advocate-witness" or "attorney-witness" rule has *no* application to a proceeding tried to a judge and not to a jury, concluding that such an argument "asks for too much." *Id.* What the court did conclude, however, is essentially in accord with the argument offered by the government here: The court in *Johnston* concluded that the risks of a prosecutor appearing in a proceeding before a judge may be less, permitting greater flexibility, because a judge may be better able to take account of the witness-prosecutor's adversarial role in weighing the prosecutor's testimony; the court would be less likely to confuse the prosecutor's two roles; and the court would be unlikely to be swayed by the prominence or prestige of the prosecutor's office. *Id.* The court also noted the problem presented to the trial court by the prospect of choosing between the credibility of the defendant or his witnesses and that of the prosecutor-witness, giving rise to possible prejudice to the defendant or an appearance of unfairness, which would be lessened if the prosecutor did not otherwise participate in the case. *Id.*

The court then considered the government's argument that a pretrial suppression hearing is a separate proceeding from a subsequent jury trial for purposes of the attorney-witness rule. *Id.* at 644–45. The

court agreed that the suppression hearing is a preliminary matter outside the presence of the jury and is concerned with one of many matters a judge may have to determine before trial, and therefore may be considered a separate proceeding from the trial, although that conclusion did not entirely resolve the matter. *Id.* at 645. Although the court concluded that the most obvious alternative is for the witness-prosecutor to withdraw from any further participation in the trial of the defendant, the court stated that "we are not imposing substitution of prosecutors as a *per se* mandatory requirement, particularly in the circumstances of this case," and exceptions existed. *Id.*

The "circumstances of th[e] case" in *Johnston* were that the defendant had made a telephone call to the prosecutor regarding alleged breach of an immunity agreement. *Id.* at 641. This fact played a role in the court's disposition of the attorney-witness issue:

> It was, after all, the defendant who placed the telephone call to Assistant Hosteny. It was the defendant who voluntarily chose to testify as to the contents of that telephone conversation. The defendant raised no objection to the government's proposed rebuttal by calling Assistant Hosteny. It was the defendant who chose the means of communication which restricted the only possible government rebuttal witness to that one assistant the defendant chose to call on the telephone.

> In these circumstances, where the defendant attempts to take advantage of a situation that was his own doing, not the government's, the government, by the only means at its disposal, should be permitted to fully attempt to thwart suppression and to impeach the defendant. We, however, take no position on the merits of the motion.

> Upon remand Hosteny shall be permitted to testify at a new suppression hearing if the necessity again arises. At the original suppression hearing, Hosteny did not seek to participate other than as a witness. Where no surprise is

involved, that restriction remains. The trial court's options of referring to a Magistrate or assigning the case to another judge for trial remain for consideration. If Hosteny further seeks to continue as a prosecutor at trial, there being no reasonable likelihood of his being called as a witness at trial, he may be permitted to do so in the circumstances of this case. In other situations a reasonable showing that substitution of government counsel at that time could prejudice the government's case would be required. Possible prejudice to the government's case as well as the defendant should be considered and balanced by the trial judge in the context of the particular circumstances.

*Johnston,* 690 F.2d at 646. The court therefore concluded, "As a general rule, the government prosecutor is not to be automatically disqualified as a witness or as trial advocate after testifying at a pretrial suppression hearing, but testifying and continuation as counsel shall be subject to the sound discretion of the trial judge exercised in accordance with the general principles discussed in this opinion." *Johnston,* 690 F.2d at 646.

This court concludes that the principles articulated in *Johnston* and the provisions of Iowa Code of Professional Responsibility quoted above provide an adequate basis for evaluating the prosecutor-as-witness issue presented here.

**2. *The circumstances of the prosecutor's testimony***

Although the *Johnston* decision and the Code of Professional Responsibility provide an adequate statement of applicable principles, the circumstances in the present case are somewhat different from those presented in *Johnston.* Here, the issue in the pretrial hearing is whether McNeese's testimony is admissible or whether there has instead been a "*Massiah* violation," which should preclude McNeese's testimony at trial. Therefore, the court should explore briefly the nature

of the issue involved in the pretrial hearing and the probable nature of AUSA Reinert's testimony.

In *Moore v. United States,* 178 F.3d 994 (8th Cir.), *cert. denied,* 528 U.S. 943, 120 S.Ct. 356, 145 L.Ed.2d 278 (1999), the Eighth Circuit Court of Appeals explained the basis and the requirements of proof for a *"Massiah* violation" as follows:

> In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court recognized that a defendant is denied the basic protections of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel." *Id.* at 206, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. Therefore, in order for [a defendant] to prevail on this claim, he would need to show that his right to counsel had attached, that [the informant] was a government agent, and that [the informant] deliberately elicited incriminating statements from him.

*Moore,* 178 F.3d at 999.

More specifically, as to the showing that the informant was a government agent, the court explained that " '[a]n informant becomes a government agent for purposes of [*Massiah* ] only when the informant has been instructed by the police to get information about the particular defendant.' " *Id.* (quoting *United States v. Birbal,* 113 F.3d 342, 346 (2d Cir.), *cert. denied,* 522 U.S. 976, 118 S.Ct. 433, 139 L.Ed.2d 333 (1997), which collected cases). As to the last required showing, proof that the informant deliberately elicited incriminating statements from the defendant, the court concluded that, where the evidence showed that the informant "did [not] do anything but act as a passive listening post in gathering this information" about the defendant, the *Massiah* claim failed. *Id.* at 1000. The court explained,

> In *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), the Supreme Court made clear that the

"primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation ... 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements.' " *Id.* at 459, 106 S.Ct. 2616, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (citing *United States v. Henry,* 447 U.S. 264, 276, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980)) (Powell, J., concurring). "[T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459, 106 S.Ct. 2616, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364. In this case, [the defendant] has not alleged anything to suggest he was subject to any improper or surreptitious interrogation.

*Moore,* 178 F.3d at 1000.

Thus, the admissibility of McNeese's testimony will hinge upon the evidence presented by the parties regarding these matters at the evidentiary hearing on March 15, 2001.

### 3. Application of the principles in the circumstances presented

 Applying the "general principles" articulated in *Johnston* and the Code of Professional Responsibility in this case, it is clear that any concerns can be avoided if AUSA Reinert withdraws, but the court is not required to disqualify him. *See Johnston,* 690 F.2d at 643–46 (the situation in which a prosecutor testifies as a witness at a pretrial suppression hearing, and intends to participate in the subsequent jury trial, should be avoided if possible, but may be permitted under some circumstances). Rather, the court concludes that AUSA Reinert may testify at the pretrial evidentiary hearing regarding the admissibility of McNeese's testimony, and *may* thereafter continue to represent the government at trial.

As to the principles articulated in the applicable Ethical Consideration and Disciplinary Rules from Canon Five of the Iowa Code of Professional Responsibility, the court is somewhat less sanguine than the government that, in the context of an alleged "*Massiah* violation," AUSA Reinert's expected testimony concerning his contact with McNeese will be "uncontested" or that "there is no reason to believe that substantial evidence will be offered in opposition to the testimony." *See* Iowa Code of Professional Responsibility DR 5–101(D)(1) & (2) (articulating these exceptions to the attorney-witness rule embodied in DR 5–102). As noted above, to prevail on her claim of a "*Massiah* violation," Johnson will be required to prove that McNeese was instructed by the police or members of the prosecutor's office to get information about her. *Moore*, 178 F.3d at 999. Thus, AUSA Reinert's likely testimony about his office's contacts with McNeese will likely be vigorously contested, if Johnson is to demonstrate that McNeese's evidence is inadmissible. *See* Iowa Code of Professional Responsibility DR 5–101(D)(1). Moreover, Johnson's attempt to contradict any assertion by AUSA Reinert that neither he, his office, or the police instructed McNeese to get information about Johnson can only be successful if she presents "substantial evidence . . . in opposition to [AUSA Reinert's] testimony," or in opposition to evidence that the police gave no such instruction. *See id.* DR 5–101(D)(2).

Nevertheless, the court is persuaded that the ethical considerations that motivate the attorney-witness rule embodied in the Iowa Code of Professional Responsibility are *not* necessarily implicated here. For example, as the government argues, the government will be able to prevent placing AUSA Reinert in the "unseemly" and "ineffective" position of "arguing [his] own credibility" by assigning a different AUSA to prosecute the hearing on the admissibility of McNeese's testimony. *See* Iowa Code of Professional Responsibility EC 5–9. Moreover, like the court in *Johnston*, this court sees some merit to the distinction between the court as a trier of fact in a pretrial matter and a jury as the trier of fact on the merits of the charges against the defendant, first, because the court is less likely to be confused about AUSA Reinert's role in the hearing on the admissibility of evidence and, second, because the court is less likely to be awed by the prominence of AUSA Reinert's position as a federal prosecutor. *See Johnston*, 690 F.2d at 644. Indeed, like the court in *Johnston*, this court finds that the differences in the nature of the issues and the trier of fact in a hearing regarding the admissibility of evidence and a trial on the merits are such that the two parts of the case might well be regarded as "separate proceedings" for purposes of application of the attorney-witness rule. *See id.* at 645. Finally, although a *Massiah* situation is not one of the defendant's own making, but one that may be attributed (indeed, to prevail, the defendant *must* show that it *is* attributable) to the government, the government nevertheless should not be deprived of the only means at its disposal to thwart the claim, which is to present the testimony of AUSA Reinert regarding the government's contacts with McNeese. *Compare id.* at 646.

As in *Johnston*, it seems likely that, where the *Massiah* issue has arisen well in advance of trial, adequate time is available to effect a substitution of government counsel to prosecute this case. *See Johnston*, 690 F.2d at 645. However, like the court in *Johnston*, the court will not impose such a substitution in this case *at this time. See id.* If it becomes apparent, after the hearing on the admissibility of evidence, that it would be inappropriate for AUSA Reinert to continue to prosecute this action, in light of his evidence and any contrary evidence presented, then the court will revisit the question of whether or not AUSA Reinert must be disqualified.

### III. CONCLUSION

Although the issues regarding attorney representation in this matter are substan-

tial and complicated, the court concludes, at least at this stage of the proceedings, that neither attorney Willett nor AUSA Reinert must be disqualified. As to attorney Willett, the court finds that there is either no conflict of interest—in light of the court's finding that no confidential matters passed between attorney Willett and witness McNeese—or only a remote possibility of any conflict of interest. The court also finds that defendant Johnson has knowingly, voluntarily, and intelligently waived her Sixth Amendment right to counsel unburdened by a potential conflict of interest. Therefore, attorney Willett may proceed in this matter. However, notwithstanding Johnson's waiver, attorney Willett must adhere to the methods chosen herein for alleviating the possibility that his representation of defendant Johnson will be burdened by a conflict of interest arising from his prior consultation with witness McNeese. As to AUSA Reinert, the court finds that there is no *per se* requirement that he withdraw if he appears as a witness at the hearing on the admissibility of McNeese's testimony and Johnson's assertion of a "*Massiah*" violation."

However, the court will revisit the questions of continued representation by these attorneys, either on motions of the parties or upon its own motion, should it become apparent in the course of subsequent proceedings that either or both attorneys should withdraw or be disqualified to avoid prejudice to the defendant, the appearance of unfairness, or to prevent ethical violations.

Again, the parties are to be commended for bringing these issues to the court's attention in a timely fashion.

**IT IS SO ORDERED.**